**UNITED ENTERPRISE & ASSOCIATES,**
Plaintiff,

v.

**The UNITED STATES, Defendant.**

**No. 05–607 C.**

United States Court of Federal Claims.

March 21, 2006.*

\* This Opinion was issued under seal on March 9, 2006. Pursuant to Part III of the Opinion, the parties were instructed to identify protected/privileged material subject to deletion. Neither party proposed any redactions.

Sam Z. Gdanski, Pomona, NY, for plaintiff. Scott H. Gdanski, Pomona, NY, of counsel.

Richard P. Schroeder, with whom were Peter D. Keisler, Assistant Attorney General,

David M. Cohen, Director, Brian M. Simkin, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant. Beverley H. Lewis, United States Small Business Administration, Washington, DC, of counsel. Andrea S. Grill, Corporation for National and Community Service, Washington, DC, of counsel.

## OPINION AND ORDER

HEWITT, Judge.

This post-award bid protest action comes before the court on cross motions for judgment on the administrative record. Plaintiff, United Enterprise & Associates (UEA), protests the decision of defendant, acting through the Corporation for National and Community Service (CNCS or the agency), to award a contract to Randolph Technology, Inc. (Randolph), for facility support services. See Complaint (Compl.) ¶¶ 3–4, 247.[1]

In its Motion, filed on July 13, 2005, plaintiff requests that the court terminate the agency's award to Randolph and direct the agency to award the contract to UEA or, alternatively, to "remand the matter back to a new independent contracting officer of the [a]gency to conduct a proper responsibility determination of UEA and[,] if found responsible, award the contract to UEA, award attorney[']s fees and bid and proposal expenses and any such other relief the [c]ourt deems proper." Pl.'s Mot. at 1. Defendant opposes plaintiff's Motion, and "further requests the [c]ourt to grant judgment upon the administrative record in favor of the United States, dismissing this action." Def.'s Mot. at 1. For the following reasons, plaintiff's Motion is DENIED and defendant's Cross Motion is GRANTED. Plaintiff's protest is therefore DISMISSED.

## I. Background[2]

### A. Pre–Proposal Activities

In April of 2000, CNCS awarded a contract for facilities support services to G.S. Tech, Inc. (GS Tech) for a base period that ended November 30, 2000, with four option years (April 2000 contract). Def.'s SOF ¶ 10.[3] The April 2000 contract required GS Tech to provide support services for the Southeast Region Campus of the AmeriCorps* National Civilian Community Corps (NCCC), a component of CNCS. Def.'s SOF ¶¶ 6, 8. The April 2000 contract was awarded through the Small Business Administration's (SBA)'s 8(a) Business Development Program (8(a) Program). Id. The 8(a) Program was enacted in its present form by the Small Business Act,[4] which empowers the SBA:

---

1. In addition to plaintiff's Complaint, the court has before it Plaintiff's Motion for a Preliminary Injunction (Pl.'s Mot. Prelim. Inj.); Plaintiff's Motion for Summary Judgment on the Basis of the Administrative Record (Pl.'s Mot. or Motion); Defendant's Opposition to Plaintiff's Motion for Summary Judgment and Defendant's Cross Motion to Dismiss and for Judgment Upon the Administrative Record (Def.'s Mot. or Cross Motion); Plaintiff's Response and Reply to Defendant's Opposition to Plaintiff's Cross Motion for Summary Judgment and Defendant's Cross Motion to Dismiss and for Judgment Upon the Administrative Record (Pl.'s Resp. or Response); Defendant's Motion to Strike Declarations of Joe Boyd and George O'Neal or, Alternatively, for Leave to Submit Declarations Responding to Allegations Regarding the Pre–Award Survey (Motion to Strike or Def.'s Mot. Strike); Plaintiff's Response to Defendant's Motion to Strike Declarations of Joe Boyd and George O'Neal, or Alternatively, for Leave to Submit Declarations Responding to Allegations Regarding the Pre–Award Survey (Pl.'s Resp. to Mot. Strike); Defendant's Reply to Plaintiff's Opposition to Defendant's Cross–Motion to Dismiss and for Judgment Upon the Administrative Record, and to

Plaintiff's Opposition to Defendant's Motion to Strike Declarations (Def.'s Reply or Reply); Plaintiff's Statement of Facts (Pl.'s SOF); Defendant's Counter–Statement of Facts (Def.'s CSOF); Defendant's Statement of Facts (Def.'s SOF); Plaintiff's Counter Statement of Facts (Pl.'s CSOF); the Administrative Record (AR); Defendant's Supplemental Brief (Def.'s Suppl. Br. or Supplemental Brief); Plaintiff's Response to Defendant's Supplemental Brief (Pl.'s Suppl. Resp. or Supplemental Response); and Defendant's Reply to Plaintiff's Response to Defendant's Supplemental Brief (Def.'s Suppl. Reply or Supplemental Reply).

2. Facts citing the filings of only one party do not appear to be in dispute.

3. Prior to the April 2000 award, GS Tech had been performing as the incumbent contractor since 1996. Pl.'s SOF ¶ 17; Pl.'s CSOF at 3 (response to Pl.'s SOF ¶ 10).

4. Pub.L. No. 85–536, 72 Stat. 384 (1958) (codified as amended at 15 U.S.C. §§ 631–657). The stated policy of the Small Business Act is to "aid,

whenever it determines such action is necessary or appropriate—

(A) to enter into contracts with the United States Government and any department, agency, or officer thereof ... [and]

(B) to arrange for the performance of such procurement contracts by negotiating or otherwise letting subcontracts to socially and economically disadvantaged small business concerns.

15 U.S.C. § 637(a)(1)(A) and (B) (2000); *see* Def.'s Mot. at 3–4.[5] It appears that GS Tech performed the April 2000 contract well. GS Tech never received any deductions for poor or deficient performance and received numerous awards during the contract term. *See* Compl. ¶¶ 25, 28; Pl.'s SOF ¶¶ 19, 22. CNCS exercised all four option years on the April 2000 contract, making the date of termination November 30, 2004. Def.'s SOF ¶ 10.

In March of 2002, GS Tech graduated from the 8(a) Program,[6] *id.* ¶ 11 (citing AR at 1032, 1482–84) and was therefore no longer eligible to participate in the 8(a) Program as a prime contractor for any new 8(a) Program set-aside contracting activities, *id.* ¶ 12 (citing 13 C.F.R. §§ 124.2, 124.108(b), and 124.301(a)). CNCS was therefore required to find a new contractor for the facilities support services contract for the Southeast Region Campus of NCCC after GS Tech's contract expired on November 30, 2004. *See id.* ¶ 12. Early in 2004, GS Tech began recommending to CNCS staff that UEA, an SBA 8(a) sole proprietorship[7] with President Joe Neal Boyd as its sole owner, *id.* ¶ 1, be selected as the new contractor for this contract, *id.* ¶ 13.

On March 17, 2004, the SBA advised CNCS that two 8(a) vendors—UEA and Randolph—had "expressed interest" in the follow-on contract that was to begin December 1, 2004. *Id.* ¶ 15 (quoting AR at 630). At that time, CNCS was interested in awarding the contract to UEA, apparently because UEA had been recommended by GS Tech, *id.* ¶ 16, and because of a potential relationship between GS Tech, a contractor with whom CNCS had been satisfied, and UEA,[8] Pl.'s SOF ¶¶ 33–34; Pl.'s CSOF at 4 (response to Pl.'s SOF ¶ 16). Indeed, on March 23, 2004, Dot White, the Regional Resource Manager for NCCC, wrote an email to Stephen Elias, the Assistant Director of Region-

---

counsel, assist, and protect, insofar as is possible, the interests of small-business concerns." 15 U.S.C. § 631(a) (2000).

**5.** Section 637(a), in conjunction with § 636(j)(10)-(16), constitutes what is commonly referred to as the 8(a) Program. Def.'s Suppl. Br. at 9. 48 C.F.R. § 19.800 (2005) explains:

(a) Section 8(a) of the Small Busines[s] Act (15 U.S.C. 637(a)) established a program that authorizes the Small Business Administration (SBA) to enter into all types of contracts with other agencies and let subcontracts for performing those contracts to firms eligible for program participation. The SBA's subcontractors are referred to as *8(a) contractors.*

(b) Contracts may be awarded to the SBA for performance by eligible 8(a) firms on either a sole source or competitive basis.

(c) When, acting under the authority of the program, the SBA certifies to an agency that the SBA is competent and responsible to perform a specific contract, the contracting officer is authorized, in the contracting officer's discretion, to award the contract to the SBA based upon mutually agreeable terms and conditions.

(d) The SBA refers to this program as the 8(a) Business Development (BD) Program.

48 C.F.R. § 19.800(a)-(d) (2005).

**6.** *See* 13 C.F.R. § 124.2 (2005) ("A firm that completes its nine year term of participation in the 8(a) BD program is deemed to graduate from the program. The nine year program term may be shortened only by termination, early graduation or voluntary graduation as provided for in this subpart.").

**7.** UEA is described in an "SBA Firm Profile." *See* AR at 1037. Under the heading "Capabilities Narrative," the SBA Firm Profile lists "Renovation, Construction, Fabrication, Residential, [and] Commercial." *Id.* Under the heading "Business Type Percentages," the SBA Firm Profile lists "Construction (75%)," "Manufacturing (10%)," "Research & Development (5%)," and "Service (10%)." *Id.*

**8.** This "potential relationship" was subsequently realized on April 14, 2004, when UEA entered into a "Teaming Agreement" with GS Tech. AR at 813–24 (Teaming Agreement); Pl.'s SOF ¶ 55. The Teaming Agreement stated that UEA and GS Tech, "because of their different capabilities, has determined that they would benefit from a Teaming Agreement between their respective organizations in order to develop an integrated team for submission of a proposal or proposals." AR at 813; Pl.'s SOF ¶ 56.

al Management for NCCC, stating that "Jim McClurg[, the Deputy Director of the NCCC,] and I talked yesterday about the maintenance contract. We'd like to award it to United Enterprise and Associate[s] *(GS Tech essentially)*. They do an excellent job and [Randolph] is an unknown." AR at 629 (emphasis added); Pl.'s SOF ¶ 32; Pl.'s CSOF at 4; Def.'s CSOF at 14.

On April 22, 2004, CNCS requested approval from the SBA to negotiate with UEA as a prospective contractor for an 8(a) sole source award.[9] *See* AR at 602 (Letter from CNCS Contracting Officer Patricia Holliday to the SBA) ("Subject: Request for authorization to obtain the services of UEA under Section 8(a) of the Small Business Act by contract with the Small Business Administration"); *see id.* ("It is the [CNCS]'s intent to obtain the services of [UEA]."); *see* Def.'s SOF ¶ 17. The SBA then conducted an examination of UEA's file and determined that UEA, at that time, had the capability to perform the CNCS facilities support services contract. AR at 908–09; Pl.'s SOF ¶ 40.[10] In a letter to CNCS dated April 28, 2004, the SBA accepted CNCS's contracting requirement into the SBA 8(a) Program on behalf of UEA. AR 601; Def.'s SOF ¶¶ 18–19. The letter stated that "[CNCS is now] authorized to conduct negotiations with [UEA]. . . . The SBA may be a party to the negotiations." AR at 601.

On May 10, 2004, CNCS issued to UEA Solicitation No. HQMBS0402 (Solicitation), a non-competitive request for proposal (RFP) with an attached Statement of Work (SOW). AR at 166–267; *see also* 48 C.F.R. § 2.101

("Solicitation means any request to submit offers or quotations to the Government."). The Solicitation was for facilities support services at the NCCC Southeast Campus, to commence December 1, 2004, for one base year, and up to four one-year option periods thereafter. AR at 166; Def.'s SOF ¶ 21. The RFP stated that UEA is "invited to submit a proposal based on the attached Statement of Work (SOW) for facilities support services, including operation, maintenance repair, alteration, and other miscellaneous services as needed by the [NCCC] Southeast Campus located in Charleston, South Carolina of . . . [CNCS]." AR at 166; Def.'s SOF ¶ 23. The RFP set forth the items required to be in the proposal and stated that the "proposal should be submitted to [NCCC] no later than June 11, 2004." AR 166; Def.'s SOF ¶ 25.

In early June, 2004, Joe Boyd, UEA president and sole owner, and Richard Furnish, GS Tech's then-Project Manager for the April 2000 contract, went to the NCCC Southeast Regional Campus offices to discuss with CNCS the contract to begin December 1, 2004. Def.'s SOF ¶¶ 31–33. Although the parties disagree about exactly what was said at this meeting, *compare* Def.'s SOF ¶¶ 33–37 *with* Pl.'s CSOF at 7–8, it apparently involved discussions of a potential "partnership" between the incumbent contractor GS Tech and UEA for the contract at issue, *see* Def.'s SOF ¶ 33, 37. After this meeting, on June 4, 2004, Mr. Boyd sent to the agency a list of questions regarding the RFP, *see* AR at 268–69, and asked for an extension of time,

---

9. Procurements offered to the 8(a) Program with an estimated value of $3 million or less ($5 million for manufacturing), including options, may be awarded on a sole source basis. Procurements with estimated values above those threshold amounts are awarded through competitions limited to eligible 8(a) participants. 13 C.F.R. § 124.506 (2005); *see generally* 15 U.S.C. § 637(a)(2)(D); 13 C.F.R. §§ 124.502, 124.503.

10. The SBA's examination report states that
[i]n making the selection [of UEA,] the following determinations were made, as applicable:
1. [UEA] has managerial and technical capability to perform.
2. [UEA] can finance from internal or external resources.
3. [UEA] can obtain bonding . . . .

4. Requirement is within approved 8(a) support level.
5. The assigned NAICS Code is appropriate[.]
6. [UEA] is approved for assigned NAICS Code.
7. [UEA] is current with financial statements for period ending 12/31/03.
AR at 908. Defendant states that this examination was nothing more than a "cursory paper review of UEA's file at that office." Def.'s CSOF at 16 (response to Pl.'s SOF ¶ 40). The court has before it no evidence to support or refute this assertion. The court agrees, however, that "the document . . . [did not] . . . obligate[] the Government to contract with UEA." *Id.* at 16–17 (response to Pl.'s SOF ¶ 40).

until July 2, 2004, within which to submit UEA's proposal in order to "make any changes to the SOW and allow us to make the required changes in our proposal," AR at 269; Pl.'s SOF ¶ 50. CNCS apparently agreed to this request, but no proposal was submitted by UEA by July 2, 2004. *See* AR at 837.

Instead, on July 8, 2004, NCCC Resource Manager Dot White sent an internal memorandum to NCCC Contract Specialist Marilyne Brooks requesting an extension of the deadline to accommodate revisions that were to be made to the SOW. AR at 271; Pl.'s SOF ¶ 51. Thereafter, the agency revised the RFP and, on July 27, 2004, invited UEA to submit a proposal in response to the revised RFP, consisting of:

   a.  A technical proposal ... which summarizes how the requirements in the SOW will be accomplished.

   b.  A cost proposal ... which shall include the information required by the attached ... Instruction for Submitting Cost/Price Proposals When Cost or Pricing Data Are Required.

   c.  Section K—Representations, Certifications, and Other Statements of Offerors or Quoters.

AR at 273. Furthermore, the RFP stated that UEA's "cost proposal should reflect the labor categories and rates necessary to accomplish the tasks listed in the SOW[,] and all other direct costs if applicable shall be shown for each year of the contract period of performance." *Id.* The SOW described in detail the work to be performed and provided six annexes and two attachments, *id.* at 350–63, which separated the various requirements into comprehensive components of the contracting activity, *id.* at 273–363. UEA's proposal was to be submitted " no later than ... August 6, 2004." *Id.* at 273. UEA, however, did not submit its proposal until August 10, 2004. *Id.* at 365.

**B. UEA's Proposal**

UEA's proposal consisted of two parts. The first part was titled "Volume I" and addressed technical, management, and financial issues. AR at 365–386; *see* Def.'s SOF ¶ 40. The second part was titled "Section B" and was a cost proposal. AR at 387–443; *see* Def.'s SOF ¶ 41. Volume I did not address specifically a number of the requirements listed in detail in the RFP or SOW, and appears to the court to be laid out in very generalized and boilerplate terms. *See, e.g.,* AR at 365–86. Indeed, none of the annexes provided for in the SOW are specifically referred to in Volume I of the proposal, nor is there a summary of how the specific "requirements in the SOW will be accomplished." *Id.* at 273(RFP); *see generally id.* at 365–86; *see* Transcript of Oral Argument (Tr.) at 42:15–43:17.

In the "Management Plan" section of Volume I of the proposal, UEA stated that it had "selected [GS Tech] as its primary subcontractor for this program." AR at 366. The proposal did not specify or propose the division of labor envisioned by UEA, but stated that "GS T[ech] will provide ongoing support and oversight to the [Simplified Acquisition of Base Engineer Requirements (SABER) ] Program." AR at 367; Def.'s SOF ¶ 43. However, CNCS does not have a SABER Program and the SABER Program was not part of the contracting activity at issue, Def.'s SOF ¶ 45; Def.'s Mot. at 15, nor was it mentioned in the RFP or SOW, *see generally* AR at 273–349. UEA also referred to itself and GS Tech as a "team," and stated that "[t]he team will use qualified local subcontractors to perform general and specialized construction tasks." AR at 366; Def.'s SOF ¶ 47. However, the performance of "general and specialized construction tasks" was not called for in CNCS's SOW. *See generally* AR at 275–349.[11] Additionally,

---

**11.** Plaintiff disputes this assessment of the SOW, stating that it contains, inter alia, "contractor requirements to maintenance, including 'Replacement, Modernization, [and] Renovation' requirements." Pl.'s CSOF at 10 (response to Def.'s SOF ¶ 48). However, the "Replacement, Modernization, [and] Renovation" section of the SOW states:

During the term of the contract, *the Government* may replace, renovate, or improve equipment, systems, facilities, components, and fixtures at the Government's expense and by *means not associated with this contract.* All replaced, improved, updated, modernized, or renovated equipment, fixtures, facilities, components, and systems shall be *maintained, oper-*

UEA stated that it used "Defense Federal Acquisition Regulation (DFARS) as a guide and outline for the development assistance GS Tech provides to [UEA]," AR at 366; Def.'s SOF ¶ 55; however, the DFARS is not applicable to the contracting activity at issue, Def.'s SOF ¶ 56.

In the "Subcontracting Plan" section of Volume I of the proposal, UEA stated that its "plans will include subcontractors capable of covering all of the 16 construction divisions." AR at 374; Def.'s SOF ¶ 49. However, there is no mention of "16 construction divisions," or, indeed, any construction divisions, in CNCS's RFP or SOW. Def.'s SOF ¶ 50; *see generally* AR at 273–363. Moreover, the requisite North American Industry Classification System (NAICS) code, cited in UEA's proposal as "561990," AR at 380, was incorrect. Def.'s SOF ¶ 51. The correct NAICS code applicable to the NCCC's requirement was 561210. Pl.'s CSOF at 11 (response to Def.'s SOF ¶ 51).[12] Finally, UEA's proposal identified no specific personnel who were to perform on the contract besides the project manager, who was apparently to be Mr. Furnish, the project manager on the incumbent contract with GS Tech. AR at 367.

### C.   CNCS's Concerns with UEA

By September of 2004, CNCS had become displeased with the performance of GS Tech and its Project Manager, Mr. Furnish. *See, e.g.*, AR at 1540 (August 31, 2004 internal CNCS memorandum stating that "[GS Tech] ha[s] been unable to fulfill [its] obligation in a professional and prompt manner"); *id.* at 1457 (August 4, 2004 memorandum from NCCC Resource Manager Dot White to NCCC Resident Manager Debra Davis indicating frustration with insufficient cleaning services by GS Tech). CNCS requested GS Tech to remove Mr. Furnish from his posi-

tion in mid-September, 2004, and GS Tech complied. *See id.* at 1450; Def.'s SOF ¶ 60 (citing AR at 1449–57, 1531–32, 1540–41). Although the Administrative Record contains few contemporaneous documents illustrating the specific problems with GS Tech or Mr. Furnish's performance around September of 2004 or earlier, *see, e.g.*, AR at 1540, 1457, Dot White, the Resource Manager for NCCC, explained in an internal memorandum written to Contracting Officer Marilyne Brooks on November 1, 2004, that "GS Tech's performance has steadily gone downhill since Steve Dey[, the former Project Manager,] left their employ, and steps to improve the situation have been minimal and slow in coming," *id.* at 1451. Therefore, stated Ms. White, CNCS was "very concerned with [UEA's] partnership with GS Tech." *Id.*

CNCS began interviewing other potential contractors, and sent another RFP, identical to the RFP sent to UEA, to Randolph on September 29, 2004. *Id.* at 510–600; Pl.'s SOF ¶ 64. Having been alerted to CNCS's concerns by SBA Business Opportunity Specialist Floyd Johnson, *see* AR at 509, Mr. Boyd sent a letter to CNCS seeking to allay these concerns on September 30, 2004, *id.* Mr. Boyd assured CNCS that

> G[S]Tech has hands-on experience with the entire project and would assist [UEA] only as long as necessary. Once the process has been reviewed and operations set up, then we will provide service without G[S]Tech involvement.
>
> *I can assure you that my firm can provide maintenance service without [GS]Tech involvement. I just … need time to review the process and set up for operation[.]*

*Id.* Despite CNCS's concerns with Mr. Furnish and his recent removal as project man-

---

*ated, and/or repaired* by the Contractor at no additional cost to the Government . . . .
AR at 283 (emphasis added). Nowhere does the SOW call for the *contractor* to perform construction-related tasks, nor does the court find that the various "maintenance," "operation," or "repair" services requested, *see* AR at 283–87, constitute "construction tasks" as plaintiff argues, *see* Pl.'s CSOF at 10 (response to Def.'s SOF ¶ 48).

12.  The SBA uses the NAICS codes to determine whether an entity qualifies as a "small business concern," generally by reference to the number of employees or the amount of annual receipts, for different classes of economic activity or industry. *See* 13 C.F.R. § 121.201 (2005); *see generally Advanced Sys. Tech., Inc. v. United States*, 69 Fed.Cl. 474, 475 (2006).

ager for the incumbent GS Tech contract, Mr. Boyd's letter did not mention Mr. Furnish or state that UEA planned to revise its proposal to replace him as project manager. *See id.*

Mr. Boyd's letter apparently did not succeed in easing CNCS's concerns. On October 25, 2005, Randolph submitted its proposal to CNCS, *id.* at 483, and the next day, Ritchie Vinson, CNCS's Chief Contracting Officer, wrote a letter to SBA's Mr. Johnson stating that

> [a]s per your instructions[,] CNCS interviewed other companies and determined from the interview that [Randolph] had the capabilities needed and requested a proposal from this company. Although you assured me that this was proper and was not considered to be soliciting competition, I am requesting that you provide CNCS with written direction on how to properly proceed from here.

*Id.* at 481; Def.'s SOF ¶¶ 70–71. Mr. Johnson responded to Mr. Vinson's letter in an email to NCCC Contract Specialist Marilyne Brooks on October 29, 2004:

> This is in response to Mr. Vinson's (Contracting Officer) letter of October 26, 2004 . . . . Per our discussions, it is a little late for a[ ] COC (Certificate of Competency) to be processed at this time. We do need a letter from your agency requesting a replacement of [UEA] with the firm you chose and details as to why this change is necessary for completion of the contract. The [SBA] will be in a better position to support your determination after receipt of this written explanation.

AR at 468–69; Def.'s SOF ¶¶ 72–73.

In the middle of this exchange, on October 28, 2004, Dot White, the Regional Resource Manager for NCCC, wrote an internal memorandum to Ms. Brooks. AR at 478–80. Ms. White stated that "[p]er [Ms. White's and Ms. Brooks'] conversation yesterday, I was under the impression that we had rejected [UEA's] proposal for the new maintenance contract." *Id.* at 478; Pl.'s SOF ¶ 76. Ms. White continued:

> However, let me clearly state that we do not want to continue doing business with GS Tech or their joint venturers after No-

vember 30, 2004. The following update should provide sound reasons for this decision. When we made the decision to allow [UEA] to submit the proposal I was still very new to my position and only learned of the problems as time progressed.

AR at 478. Ms. White then expounded on numerous reasons for CNCS's dissatisfaction with the performance of GS Tech, including problems with GS Tech's Project Manager; dissatisfaction with GS Tech's pest control, lawn care, mechanical, and maintenance services; water damage in CNCS facilities; problems related to GS Tech's unresponsiveness to service requests; and unacceptable performance of everyday tasks. *Id.* at 478–80.

On November 1, 2004, in a similar internal memorandum, Ms. White further elaborated on "why [CNCS is] requesting replacement of [UEA] with Randolph Technologies." *Id.* at 475. Ms. White stated:

> We have doubts that [UEA] will be able to fulfill the terms of the contract, not only because of their partnership with GS Tech but also because of Joe Boyd's apparent lack of concern or interest. Specifically, [UEA] lists Rick Furnish as the Project Manager. However, we recently requested that Rick Furnish be removed as the Project Manager for GS Tech due to poor communication, and failure to follow through . . . .

> [W]e believe . . . [UEA]did not have the correct [Standard Industrial Classification (SIC)/NAICS] codes to be considered for this contract. When we asked Rick Furnish about this he stated it was "no big deal[.]"

> Since Mr. Boyd's . . . visit I was contacted only once by Mr. Boyd requesting a status on his proposal. Jim McClurg was never called. He never contacted us again; however, GS Tech has asked about the status several times and in fact stated that if we were not satisfied with the partnership with [UEA,] they (GS Tech) had other options for partnerships.

> Finally[,] we are very concerned with [UEA's] partnership with GS Tech. As noted in my memo dated October 28, 2004[,]

GS Tech's performance has steadily gone downhill since Steve Dey left their employ, and steps to improve the situation have been minimal and slow in coming. Therefore, I reiterate, we do not want any partnership with GS Tech and therefore, respectfully request the contract be replaced with Randolph Technologies.

*Id.*

On November 5, 2004, UEA owner Joe Boyd wrote a letter to CNCS Contracting Officer Patricia Holliday, stating, "I [have] been informed unoffic[i]ally that my capability to [p]erform the NCCC contract ... [has] been questioned [b]y your agency ...." *Id.* at 473. Mr. Boyd stated that he "talk[ed] with [M]s. [M]arilyne [B]rooks concerning this matter[, and] she [i]nform[ed] me that they [were] looking at other option[s] concerning ... awarding the contract...." *Id.* Moreover, Mr. Boyd stated that he "talk[ed] with [M]r. [F]loyd Johnson[, t]he SBA representative for the ... 8[(]a) program[,] about this matter [a]nd ask[ed] him to intervene on my firm['s] be[ ]half...." *Id.* Mr. Boyd concluded by stating that *"if this award [ha]s been award[ed] to another contract[or],* I[ ]am filing *a letter of protest against [CNCS* f]or [conducting an] improper evaluation process ...."* *Id.* The court has no indication that CNCS ever responded to Mr. Boyd's letter.

On November 9, 2004, Ritchie Vinson responded to SBA Business Opportunity Specialist Floyd Johnson's request for a "letter from [CNCS] requesting a replacement of [UEA] with the firm [CNCS] chose and details as to why this change is necessary for the completion of the contract." AR at 469; *id.* at 470–72. Mr. Vinson's letter requested the replacement of UEA with Randolph, and went on to explain the reasons for this request:

Based on [CNCS's] recent, direct experience this past year, and the professional experience of [UEA], we do not believe that [UEA] would be able to properly fulfill the requirements or terms of the new maintenance contract.

.... [UEA] seems ill prepared to perform the required services without extensive support from GS Tech....

. . . .

[UEA] lists in its proposal for the new contract Mr. Furnish, to serve as its new Project Manager. Recently, [CNCS] officials at the NCCC Charleston campus requested that Mr. Furnish be removed as the GS Tech Project Manager due to poor communication, and failure to follow through.

. . . .

Furthermore, upon further review of [UEA's] proposal and credentials, it is clear that while the new contracting activity requires the performance of facilities maintenance services, that is not the area of [UEA's] professional experience or expertise. Rather, [CNCS] has found that [UEA's] principal personnel work in construction contracting. Constructi[on] contracting is far different work from providing maintenance services for a live-in dormitory campus. Also[,] the [UEA] proposal makes reference to construction work on a "SABER program", possibly referring to a Department of Defense military project, wholly unrelated to [CNCS]'s required contracting activity.

In addition, [CNCS's] experience with GS Tech during the past year at the NCCC Charleston campus has not been favorable. GS Tech's performance has steadily gone downhill since Steve Dey left their employ, and steps to improve the situation have been minimal and slow in coming.

*Id.* at 470–71. Thus, Mr. Vinson requested the SBA to "withdraw [UEA] from consideration" as soon as possible. *Id.* at 472.

On November 11, 2004 SBA District Director Ms. Singleton and Mr. Johnson contacted NCCC Contract Specialist Marilyne Brooks and left a voicemail message indicating that CNCS could not simply replace UEA with another 8(a) vendor. Def.'s SOF ¶ 79; *see* AR at 467 (E-mail from Ms. Brooks to Ms. Singleton and Mr. Johnson indicating receipt of voicemail). Ms. Brooks replied in an email to Ms. Singleton and Mr. Johnson the next day:

In your joint voicemail yesterday you indicated [that] now you are not inclined to

replace the 8(a) contractor. You said that you directed Mr. Boyd to the appropriate SBA office to file for a Certificate Of Competency (COC). That COC application process can take quite a bit of time as you are aware. In [the] meantime, my agency is left without recourse to select an appropriate contractor to do the required work.

I kindly ask you to please revisit [CNCS's] request for an 8(a) replacement and/or to please advise what we can do to resolve this issue immediately.

AR at 467. That same day, Ms. Singleton responded:

Forgive any confusion that we may have caused with regard to your desire to replace the proposed 8(a) contractor on this project.

We were mistaken. We cannot just replace the firm. According to Subpart 19.6 of the [Federal Acquisition Regulations (FAR) ], the firm may request a Certificate of Competency. Also[,] according to 48 C.F.R.[§ ] 19.809, "The contracting officer should request a preaward survey of the 8(a) contractor whenever considered useful. If the results of the preaward survey or other information available to the contracting officer raise substantial doubt as to the firm's ability to perform, the contracting officer *must refer the matter to SBA for Certificate of Competency* consideration under subpart 19.6."

I have spoken with our Contracting Office in Atlanta, GA. The processing time for a COC is 15 days. You can ask for a rush on it. Please submit your request for a COC . . . .

*Id.* at 466; Def.'s SOF ¶¶ 82–83.[13] After being forwarded this email exchange, *see* AR at 1681–82, Andrea Grill, CNCS counsel,

wrote an internal email to Ms. Brooks, stating that CNCS should "ask Mr. Hansen of SBA for a rush," *id.* at 1681. Ms. Grill suggested that CNCS send "the earlier Nov. 9 letter we sent to Singleton/Johnson at SBA, along with a new letter, reiterating the rush—to Hansen . . . . Along with calling him after, and politely and insistently making sure he's 'on it' and we can get a new 8(a) contractor all before [the] end of Nov[ember]." *Id.; see* Pl.'s SOF ¶ 119.

**D. The Preaward Survey**

On November 15, 2004, in accordance with Ms. Singleton's suggestion, CNCS Contracting Officer Mr. Vinson directed that CNCS conduct a preaward survey.[14] Def.'s SOF ¶ 85; *see* AR at 462–64 (preaward survey). Accordingly, NCCC Resource Manager Dot White, accompanied by NCCC Resident Manager Debra Davis, drove to UEA's place of business to conduct a preaward survey. Def.'s SOF ¶ 86. Ms. White called UEA that morning and left a message indicating that she would be coming. *Id.* ¶ 88; Pl.'s CSOF at 18 (response to Def.'s SOF ¶ 88). Ms. White and Ms. Davis arrived in the early afternoon to find Mr. Boyd on the telephone with GS Tech president George O'Neal. Def.'s SOF ¶¶ 90–92; Pl.'s SOF ¶ 129. Ms. White conducted the preaward survey, asking Mr. Boyd questions about how UEA intended to perform the contracting activity that was to begin in two weeks. Def.'s SOF ¶ 93.

After conducting the preaward survey, Ms. White completed Standard Form 1403 (SF 1403), a General Services Administration (GSA) form prescribed under the FAR, *see* 48 C.F.R. § 53.209–1(a) (2005), for procuring agencies to use when conducting a preaward

---

**13.** 48 C.F.R. § 19.601 describes the general COC procedure, stating, in pertinent part:

(a) A [COC] is the certificate issued by the [SBA] stating that the holder is responsible (with respect to all elements of responsibility, including, but not limited to, capability, competency, capacity, credit, integrity, perseverance, tenacity, and limitations on subcontracting) for the purpose of receiving and performing a specific Government contract.

(b) The COC program empowers the [SBA] to certify to Government contracting officers as to all elements of responsibility of any small

business concern to receive and perform a specific Government contract. The COC program does not extend to questions concerning regulatory requirements imposed and enforced by other Federal agencies.

48 C.F.R. § 19.601(a)-(b)(2005).

**14.** The definition of "preaward survey" is set forth at 48 C.F.R. § 2.101, which states: "Preaward survey means an evaluation of a prospective contractor's capability to perform a proposed contract." 48 C.F.R § 2.101.

survey, Def.'s SOF ¶ 94. In an attachment to the SF 1403, Ms. White described her findings:

> Currently, Mr. Boyd has no connections in the Charleston area except through G.S. Tech. His company is located in his home in Gray Court, [South Carolina] approx[imately] 185 miles from Charleston. His intention is to hire current G.S. Tech employees to perform the work, even though I specifically stated we were there to determine his plan to handle this contract without G.S. Tech's assistance. When asked what equipment he had[,] he stated [that] he planned to purchase equipment from G.S. Tech or purchase items on his own. When asked where his office would be located[,] he stated that he would use the office in the garage area of the work site until he could find a location. When asked who the Project Manager would be[,] Mr. Boyd stated that G.S. Tech had let Rick Furnish go and he didn't know why, but that he would hire Mr. Furnish back for the position. For the position of Quality Control and Safety Rep he stated that this . . . was not yet determined. . . .

> Mr. Boyd is a sole proprietor with a total equity of $24,892 as of July 31, 2004 . . . . He is bonded through BB & T Goldsmith Joyner . . . for $100K and his [i]nsurance is through Stovers Agency . . . with [$]1M general liability and [$]5M in general aggregate. . . .

> . . . .

[After he showed me his list of accounts for credit,] I restated to Mr. Boyd everything I had written and he concurred with my findings.

Summary Opinion:

> In my opinion, [UEA] is unable to handle the maintenance contract with [NCCC]. Though his intention is to hire G.S. Tech employees[,] there is no guarantee these employees would accept his offer. Furthermore, his cashflow is limited and insufficient to handle this contract on his own. Though he strongly stated he could do this contract without the assistance of G.S. Tech, he clearly cannot and he has no other company in mind to assist him other than G.S. Tech.

AR at 464.

### E. Certificate of Competency Review

On November 23, 2004, after receiving the results of the preaward survey, CNCS Chief Contracting Officer Mr. Vinson determined that UEA was non-responsible [15] and no longer eligible for the award of the NCCC contracting activity. Def.'s SOF ¶ 111. Accordingly, Mr. Vinson wrote a letter to SBA Industrial Specialist Mr. Hansen indicating that this non-responsibility determination had been made and the reasons therefor, attaching, inter alia, the SF 1403. AR at 454–60; Def.'s SOF ¶ 112–13. Mr. Vinson also submitted to the SBA a separate letter containing a Certificate of Competency (COC) referral.[16] AR at 461 (COC referral letter); Def.'s SOF ¶ 113. Mr. Vinson wrote:

---

15. 48 C.F.R. § 9.104–1 provides the general standards for determining responsibility:

> To be determined responsible, a prospective contractor must—
> (a) Have adequate financial resources to perform the contract, or the ability to obtain them . . . ;
> (b) Be able to comply with the required or proposed delivery or performance schedule, taking into consideration all existing commercial and governmental business commitments;
> (c) Have a satisfactory performance record . . . . A prospective contractor shall not be determined responsible or nonresponsible solely on the basis of a lack of relevant performance history, except as provided in 9.104–2;
> (d) Have a satisfactory record of integrity and business ethics;
> (e) Have the necessary organization, experience, accounting and operational controls, and technical skills, or the ability to obtain them (including, as appropriate, such elements as production control procedures, property control systems, quality assurance measures, and safety programs applicable to materials to be produced or services to be performed by the prospective contractor and subcontractors) . . . ;
> (f) Have the necessary production, construction, and technical equipment and facilities, or the ability to obtain them . . . ; and
> (g) Be otherwise qualified and eligible to receive an award under applicable laws and regulations.
> 48 C.F.R. § 9.104–1.

16. 48 C.F.R. § 9.103 states, in pertinent part:

> (a) . . . [C]ontracts shall be awarded to[ ] responsible prospective contractors only.

The Office of Procurement Services has determined that [UEA] lacks certain elements of responsibility that would enable the company to perform facilities support services, including operation, maintenance repair alteration, and other miscellaneous services for our agency in a satisfactory manner. Therefore ..., we hereby request that the [SBA] issue a Certificate of Competency for this firm.

AR at 454 (nonresponsibility determination letter).[17] Mr. Vinson's letter reiterated many of the concerns raised by Ms. White in the SF 1403, *see id.* at 455, and noted that CNCS "do[es] not have much time to complete this task because the current contract ends on November 30, 2004," *id.* at 461 (COC referral letter). Thus, Mr. Vinson urged the SBA to "expedite [its] decision." *Id.*

The SBA also received from UEA an application for a COC on December 15, 2004. *Id.* at 933; Def.'s SOF ¶ 115; *see* AR at 932–1200 (Application for a COC)[18] The application included a letter of commitment from Richard Furnish, stating that he "agree[d] to perform duties as Project Manager/Superintendent for [UEA] upon award of the [CNCS] contract to [UEA] ...." AR at 993. Soon after receiving UEA's COC application, the SBA Regional Office performed a review.

Pl.'s SOF ¶ 141. After analyzing UEA's financial capability to perform on the contract, on December 22, 2004, SBA Loan Specialist Lois Johnson approved UEA's COC application, and SBA Deputy District Director Ms. Singleton stated that she "recommend[ed] approval of this COC." AR at 936; Pl.'s SOF at 141. District Director Eliot Cooper also signed this approval. AR at 937.

However, this did not conclude the COC review process. *See generally* 48 C.F.R. § 19.601(a) (stating that the SBA is to evaluate elements beyond financial capability to determine responsibility before issuing a COC); *C & G Excavating v. United States*, 32 Fed.Cl. 231, 238–39 (1994) ("The literal language of [48 C.F.R. § 19.601(a)] implies that in issuing the COC, the SBA may evaluate all elements of responsibility. The general factors to be evaluated in determining whether a prospective contractor qualifies as responsible are set forth at [48 C.F.R.] § 9.104–1. These factors include an evaluation of the prospective contractor's financial resources, performance record, and production facilities."). SBA Industrial Specialist George Hansen conducted interviews with UEA sole owner Mr. Boyd and GS Tech president Mr. O'Neal and evaluated UEA's technical capabilities, its plant, facility, equip-

(b) No purchase or award shall be made unless the contracting officer makes an affirmative determination of responsibility. In the absence of information clearly indicating that the prospective contractor is responsible, the contracting officer shall make a determination of nonresponsibility. If the prospective contractor is a small business concern, the contracting officer shall comply with subpart 19.6, Certificates of Competency and Determinations of Responsibility.
48 C.F.R. § 9.103.

**17.** 13 C.F.R. § 125.5(a)(2) states: "A contracting officer must, upon determining an apparent low small business offeror to be nonresponsible, refer that small business to SBA for a possible COC ...." 13 C.F.R. § 125.5(a)(2) (2005); *see also* 48 C.F.R. § 19.601(c) (same). 48 C.F.R. § 19.602–1 states, in pertinent part:

(a) Upon determining and documenting that an apparent successful small business offeror lacks certain elements of responsibility (including, but not limited to, capability, competency, capacity, credit, integrity, perseverance, tenacity, and limitations on subcontracting ...) the contracting officer shall—
(1) Withhold contract award ...; and

(2) Refer the matter to the cognizant SBA Government Contracting Area Office (Area Office) serving the area in which the headquarters of the offeror is located, in accordance with agency procedures ....
....
(c) The referral shall include-
(1) A notice that a small business concern has been determined to be nonresponsible, specifying the elements of responsibility the contracting officer found lacking ....
48 C.F.R. § 19.602–1; *see also* 13 C.F.R. § 125.5(c) (providing for same procedure in almost identical terms).

**18.** 13 C.F.R. § 125.5(d) states, in pertinent part:

(1) Upon receipt of the contracting officer's referral, the Area Office will inform the concern of the contracting officer's negative responsibility determination, and offer it the opportunity to apply to SBA for a COC ....
(2) The COC application must include all information and documentation requested by SBA and any additional information which the firm believes will demonstrate its ability to perform on the proposed contract.
13 C.F.R. § 125.5(d)(1), (2).

ment, and material availabilities, its production and performance capabilities, and its performance record. *See* AR at 1419–22; Def.'s SOF ¶ 116; *cf.* 13 C.F.R. § 125.5(d)(3) ("Upon receipt of a[n] ... application, SBA may elect to visit the applicant's facility to review its responsibility. SBA personnel may obtain clarification or confirmation of information provided by the applicant by directly contacting suppliers, financial institutions, and other third parties upon whom the applicant's responsibility depends."); 13 C.F.R. § 125.5(f)(1) ("The COC review process is not limited to the areas of nonresponsibility cited by the contracting officer. SBA may, at its discretion, independently evaluate the COC applicant for all elements of responsibility ....").

Following this investigation, on December 29, 2004, Mr. Hansen prepared a Narrative Report for the SBA. AR at 1419–22. In the Narrative Report, under the heading "Technical Capabilities," Mr. Hansen noted that "the contracting officer ... for [CNCS] has found [that] 'UEA, M[r.] Boyd owner[,] does not have the technical ability to perform on this bid requirement ....'" *Id.* at 1420. Mr. Hansen then stated, "In my opinion[,] Mr. Boyd does not have the technical capabilities to perform this bid item without GS [T]ech help." *Id.* Mr. Hansen listed the specific reasons for this finding:

1. [Mr. Boyd] has no [k]nowledge of the cost estimate, when asked about the cost he tells me to talk to his project manager, Mr. Richard Furnish[, w]ho did the break[ ]down on the cost estimates for this job.

2. Mr. Boyd has to use GS Tech subcontractors for supplying required jobs (a. fire alarm service, (b. waste disposal[,] (c. cleaning Bldg. 202,669,676, [ ](d. pest control,[ ](e. uniforms, (f. backflow, (g. boiler rebuild, [ ](h. water loop testing, [ ](i. lawn/grounds maintenance, (j[.] pm maintenance, [ ](k[.] fuel oil and all materials and suppl[ie]s. [T]hese are subcontracting jobs.

3. As of Dec[ember] 30, 2004[,] Mr. Boyd does not have a[n] approved project manager for this job[.] ... Mr. Furnish was requested to be removed as

project manager with GS Tech in Sept[ember] 2004. The question is why did Mr. Boyd still use Mr. Furnish when GS Tech removed him. On [December 28, 2004,] Mr. Boyd sent me [five] resumes [t]o look over but didn't state which one would be the new project manager .... With[ ]out GS Tech[, UEA] couldn't perform this bid requirement.

4. [UEA's] technical proposal[,] date[d December 5, 2004,] shows Mr. Furnish as project manager.

5. [UEA] will hire GS Tech employees which have been performing the job for GS Tech. [UEA] has [a] written letter from employees[:]

   (a. Richard Hale, mechanical technician.

   (b. Theodore Brown, electrical technician.

   (c. Robert Bright, general maintenance.

   (d. Alfreda Green, custodial maintenance.

*Id.*

Under the heading "Plant, Facilities and Equipment," Mr. Hansen found that "[UEA] has no facilities or equipment for this bid requirement[, and] he will be leasing all equipment and facilities from GS Tech ...." *Id.* Under the heading "Material Availability," Mr. Hansen found that "[UEA] will be sub contracting all supplies from GS Tech." *Id.* Under the heading "Performance Record," Mr. Hansen found that "[f]or [UEA, past and current performance] is rated satisfactory. [UEA] subcontractor GS [Tech's] performance is rated poor by [CNCS]." *Id.* Under the heading "Production/Performance Capability," Mr. Hansen found that "[UEA] will use GS Tech as a subcontractor on jobs that require yearly checks or clean up. [CNCS] does not want GS Tech on this contract ..., which would leave [UEA] unable to perform the required task[s] with[ ]out GS Tech help." *Id.* at 1421.

In conclusion, Mr. Hansen stated:

In my opinion, [UEA and Mr. Boyd] lack[ ] the technical capabilities to perform this bid requirement[. Mr. Boyd's] sub[ ]con-

tractor[,] GS Tech[,] which [will do] most of the work for [UEA,] has had problems on the job with [CNCS] [in] the last 6 months and was rated poor[.] [GS Tech] is not wanted as a subcontractor which leaves [ ]UEA with no subcontractor or letters to perform the work. Cost estimates were done by proposed project [manager Richard Furnish, who] can not be used.

*Id.* Thus, Mr. Hansen "recommend[ed] that a COC not be issued from a[ ] CAPACITY standpoint." *Id.* at 1422.

On December 30, 2004, the SBA received from GS Tech—not from UEA—another résumé of a prospective Project Manager for the contracting activity. *Id.* at 1433–36. Also on that date, SBA Business Opportunity Specialist Mr. Johnson sent an email regarding UEA's COC to Mr. Hansen and SBA District Director Ms. Singleton. *Id.* at 1428. Mr. Johnson noted that he "ha[s] been working with Mr. Boyd (at [UEA]) for the past [f]our years[ ] as his Business Opportunity Specialist. The largest project that [UEA] has handled is in the area of $50,000 during this period of time." *Id.* Mr. Johnson continued:

> We agreed to match [UEA] with the $3 [m]illion [p]roject with [CNCS] with the under[ ]standing that [UEA] would be teaming with GS Tech (the incumbent firm) to assist with the [m]anage[me]nt and [f]inancial requirement[s] of the contract. . . .
>
> . . . .
>
> Based on the above and previous information, I am of the opinion that [UEA] is unable to manage and finance the [CNCS

c]ontract with[ ]out a teaming arrangement.

*Id.*

Based on all of this information, the SBA decided to deny the COC. On January 6, 2005, SBA Area Director Mitchell Morand wrote CNCS Contracting Officer Mr. Vinson to inform him of this decision. *See id.* at 1478 ("Based on comprehensive analysis of all available facts and information, the SBA has determined to decline to issue a COC in this instance."); Def.'s SOF ¶ 129; Pl.'s SOF ¶ 154. On that same day, Mr. Morand notified Mr. Boyd of this decision in a letter, stating:

> Based on our analysis of all relevant facts and information, the [SBA] has determined *NOT* to issue a[COC] in . . . regard to [CNCS]'s solicitation . . . .
>
> The SBA has given careful consideration to your company's application for a COC and finds a lack of assurance that the proposed contract would be completed as required by the solicitation. Furthermore, the SBA finds no sufficient reason for disagreeing with the decision of the contracting officer. The COC Review Committee met and the decision to deny [UEA] a COC was based on technical and past performance of GS Tech, your subcontractor for this project. We regret that present conditions do not justify the issuance of a COC on this solicitation. . . .
>
> If you wish to meet with the SBA to discuss the reasons for this denial or require further information, please contact this office . . . .

AR at 1477.[19]

## F. GAO Protest

On January 18, 2005, UEA filed a protest with the Government Accountability Office

---

19.   48 C.F.R. § 19.602–2 states, in pertinent part: "Within 15 business days . . . after receiving a notice that a small business lacks certain elements of responsibility, the SBA Area Office will . . . [,] [a]t the completion of the process, notify the concern and the contracting officer that the COC is denied or is being issued." 48 C.F.R. § 19.602–2(e).

13 C.F.R. § 125.5 states, in pertinent part: (j)(2) After reviewing all available information, the [Associate Administrator for Government

Contracting (AA/GC)] will make a final decision to either issue or deny the COC. If the AA/GC's decision is to deny the COC, the applicant and contracting agency will be informed in writing by the Area Office. . . .
(k) . . . The notification to an unsuccessful applicant following either an Area Director or a Headquarters denial of a COC will briefly state all reasons for denial and inform the applicant that a meeting may be requested with appropriate SBA personnel to discuss the denial. 13 C.F.R. § 125.5(j)(2) and (k).

(GAO) based on the non-award of the contract at issue. *See id.* at 43. On April 4, 2005, the GAO denied UEA's protest, *see id.* at 836–41, concluding that "[C]NCS's and [the] SBA's actions here reflect the agencies' concerns and judgment that UEA was not capable of adequately performing the required services, as well as a lack of familiarity as to how to proceed in the context of a noncompetitive section 8(a) acquisition, rather than bad faith," *id.* at 841. On May 6, 2005, the GAO denied UEA's request for reconsideration of the denial of its protest. *Id.* at 852–53.

### G. GS Tech Continues as Incumbent Contractor Until Randolph is Awarded Contract; UEA Files Complaint

CNCS extended GS Tech's contract every month between November 30, 2004 and May 31, 2005, apparently waiting for the situation with UEA to be resolved. *See id.* at 1704, 1713, 1728, 1737–38, 1747, 1753; Def.'s SOF ¶ 136. On May 27, 2005 CNCS and Randolph entered into a contract for the NCCC maintenance services contracting activity, and Randolph began performance on June 1, 2005. *See* AR at 1757–98 (contract); Def.'s SOF ¶ 137. Soon afterwards, on June 8, 2005, UEA filed the post-award bid protest before the court.

## II. Discussion

Plaintiff's post-award bid protest seeks the following permanent injunctive relief: (1) a finding that the record contains sufficient evidence showing that UEA has the required responsibility to perform on the NCCC maintenance support services contract and therefore, in accordance with such a finding, an order directing CNCS to award the contract to UEA; (2) alternatively, an order remanding the matter back to a new and independent contracting officer of CNCS to conduct a proper responsibility determination and award the contract to UEA if UEA is found responsible; (3) an order awarding plaintiff attorney's fees and bid and proposal expenses; and (4) an order granting any other relief the court deems proper. Compl. at 46; Pl.'s Mot. at 40. Plaintiff's allegations supporting the relief it seeks can be summarized

as follows: First, plaintiff alleges that CNCS, after specifically choosing UEA for the NCCC maintenance support services sole source contract, arbitrarily, capriciously, and in bad faith made the determination that UEA should not be awarded the contract without conducting a preaward survey, making a proper responsibility determination, or expressing to UEA any of its concerns. *See* Pl.'s Mot. at 7–16. Second, plaintiff alleges that when CNCS finally did conduct a preaward survey and make a responsibility determination, it did so improperly and in bad faith, and that the results of the preaward survey and responsibility determination were "predetermined" by CNCS. *See id.* at 19–21. Third, plaintiff alleges that the COC process at the SBA was "a sham" because CNCS pressured the SBA into declining to issue a COC despite the fact that UEA was qualified to perform on the contract. *See id.* at 25–33.

### A. Standard of Review

Plaintiff alleges jurisdiction under the Tucker Act. Compl. at 1, ¶ 3. The Tucker Act, as amended by the Administrative Dispute Resolution Act (ADRA), 28 U.S.C. § 1491(b), confers jurisdiction on this court

> to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

28 U.S.C. § 1491(b)(1) (2000).

The parties have filed cross-motions for judgment on the administrative record under Rule 56.1 of the Rules of the Court of Federal Claims (RCFC) 56.1. Pl.'s Mot. at 1; Def.'s Mot. at 1. RCFC 56.1 governs the court's review of an agency's decision on the basis of an administrative record. RCFC 56.1. As the Federal Circuit recently observed in *Bannum, Inc. v. United States,* "[A] judgment on the administrative record [is distinguishable] from a summary judgment requiring the absence of a genuine issue of material fact." 404 F.3d 1346, 1355 (Fed.Cir.2005). "[U]nder RCFC 56.1, the existence of a fact question neither precludes

the granting of a motion for judgment nor requires this court to conduct a full blown evidentiary proceeding. Rather, such fact questions must be resolved by reference to the administrative record, as properly supplemented-in the words of the Federal Circuit, 'as if [this court] were conducting a trial on [that] record.'" *Int'l Outsourcing Servs., LLC v. United States,* 69 Fed.Cl. 40, 45–46 (2005) (quoting *Bannum,* 404 F.3d at 1357) (citations omitted).

■ The court reviews a bid protest action under the standard set forth in Section 706 of the Administrative Procedure Act (APA), 5 U.S.C. § 706 (2000). *See NVT Techs., Inc. v. United States,* 370 F.3d 1153, 1159 (Fed.Cir. 2004) (stating that APA standard of review is applicable in bid protest context). The APA provides that an agency's decision is to be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2000); *see Galen Med. Assocs., Inc. v. United States,* 369 F.3d 1324, 1329 (Fed.Cir.2004) (stating standard); *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1332 (Fed.Cir.2001) (*Impresa*) (same); *Advanced Data Concepts, Inc. v. United States,* 216 F.3d 1054, 1057 (Fed.Cir. 2000) (same). "[T]he court implements this APA standard by applying the standard as previously interpreted by the district court[ ] in ... *Scanwell [Labs., Inc. v. Shaffer,* 424 F.2d 859 (D.C.Cir.1970) ]." [20] *Banknote Corp. of Am., Inc. v. United States,* 365 F.3d 1345, 1351 (Fed.Cir.2004).

■ The Federal Circuit has stated that, under the APA standard applied in *Scanwell,* and now under the ADRA, " 'a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" *Banknote,* 365 F.3d at 1351 (quoting *Impresa,* 238 F.3d at 1332). When challenging a procurement on the ground of a regulatory or procedural violation, the protester "must show a clear and prejudicial violation of [the] applicable statutes or regulations." *Id.* (quoting *Impresa,* 238 F.3d at 1333). Moreover, the protestor "must show that there was a 'substantial chance' it would have received the contract award absent the alleged error." *Id.*

■ If the protester fails to demonstrate that a procurement statute, regulation, or procedure has been violated, the court's review of the award decision focuses on whether the decision was arbitrary, capricious, or an abuse of discretion. *See* 5 U.S.C. § 706(2)(A). Under the arbitrary and capricious standard of review, the court must sustain an agency's award if it has a rational basis. *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). "The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." *Advanced Data Concepts,* 216 F.3d at 1058. The reviewing court may not substitute its judgment for that of the agency. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416–20, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Three S Constructors, Inc. v. United States,* 13 Cl.Ct. 41, 45 (1987) ("A court is not free to invalidate the agency decision because a different result could be reached on the record."); *Varicon Int'l v. Office of Pers. Mgmt.,* 934 F.Supp. 440, 444 (D.D.C.1996) ("So long as there is a reasonable basis for an agency's action in matters involving procurement, 'the court should stay its hand, even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.'" (quoting *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301 (D.C.Cir.1971))).

"Identical review standards apply under the APA in the context of a sole-source award." *Emery Worldwide Airlines, Inc. v. United States,* 264 F.3d 1071, 1086 (Fed.Cir. 2001). In other words,

a sole source award may be set aside if either: (1) the sole-source award lacked a

---

**20.** In *Scanwell,* the circuit court upheld the district court's review of government procurement decisions under the APA. *See Scanwell,* 424 F.2d at 874–75.

rational basis; or (2) the sole-source procurement procedure involved a violation of a statute, regulation, or procedure.... The test for reviewing courts is to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.

*Id.*

When a plaintiff requests a permanent injunction, as here, *see* Compl. at 46, the court must consider: "(1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief," *PGBA, LLC v. United States,* 389 F.3d 1219, 1228–29 (Fed.Cir.2004); *see also CSE Constr. Co., Inc. v. United States,* 58 Fed.Cl. 230, 262 (2003) ("The test for a permanent injunction is almost identical to that for a temporary restraining order or preliminary injunction, but rather than the likelihood of success on the merits, a permanent injunction requires success on the merits."); *MCS Mgmt., Inc. v. United States,* 48 Fed. Cl. 506, 511 (2001) (stating standard). "Injunctive relief [is] awardable ... only in extremely limited circumstances." *CACI, Inc.-Fed. v. United States,* 719 F.2d 1567, 1581 (Fed.Cir.1983) (quotations and citation omitted).

### B. Supplementation of the Administrative Record

As an initial matter, the court resolves Defendant's Motion to Strike Declarations of Joe Boyd and George O'Neal or, Alternatively, for Leave to Submit Declarations Responding to Allegations Regarding the Pre–Award Survey (Motion to Strike or Def.'s Mot. Strike) and responsive briefing. Defendant moves the court to "strike the declarations of Joe Boyd ... and George O'Neal, which are annexed as exhibits to the complaint of plaintiff ... and are relied upon by UEA in its motion for judgment upon the administrative record." Def.'s Mot. Strike at 1. Defendant argues that these declarations "contain irrelevant, immaterial and argumen-

tative allegations that are to[o] numerous to list.... Further, the declarations repeatedly make factual assertions without citing any documentary support, whether in the record or otherwise." *Id.* at 2. In addition, defendant requests that if the court does not strike these declarations in their entirety, the court should "grant leave to file the declarations of Ms. White and Ms. Davis so that we have the opportunity to correct erroneous allegations [made] by Mr. Boyd about the pre-award survey." *Id.*

Plaintiff responds that "[i]n order for th[e c]ourt to determine whether the Agency's actions were rational, arbitrary and capricious or a violation of law and regulation, both the Supplemental Declaration of Joe Boyd and the Supplemental Declaration of George O'Neal[,] as well [a]s the two Declarations offered by ... d]efendant, should be admitted into evidence." Pl.'s Resp. to Mot. Strike at 2. Citing a number of cases, plaintiff argues that "granting supplement[ation of] the administrative record is more the norm than the exception.... [T]his [c]ourt by many different [j]udges has permitted the supplementation of the administrative record to aid it." *Id.* at 3. Thus, plaintiff asserts, the court should do so in this case as well. *Id.* at 1.

When deciding cross motions for judgment on the administrative record, "the focal point for judicial review 'should be the administrative record already in existence, not some new record made initially in the reviewing court.'" *Al Ghanim Combined Group Co. Gen. Trad. & Cont. W.L.L. v. United States,* 56 Fed.Cl. 502, 508 (2003) (quoting *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) (per curiam)). However, it is also true that, "[a]s a practical matter ..., in most bid protests, the 'administrative record' is something of a fiction," *Cubic Applications, Inc. v. United States,* 37 Fed.Cl. 345, 350 (1997), because it "is not a documentary record maintained contemporaneously with the events or actions included in it," *Tech Sys., Inc. v. United States,* 50 Fed.Cl. 216, 222 (2001). "Rather, the administrative record is a convenient vehicle for bringing the decision of an administrative body before a reviewing agency or a court." *Id.*

Accordingly, the court does not "apply an iron-clad rule automatically limiting its review to the administrative record." *Graphic-Data, LLC v. United States,* 37 Fed.Cl. 771, 779 (1997). Instead, " 'the judge should determine whether the agency action before the court is susceptible to a record review. If the answer is yes, the judge must limit review to the record.' " *Al Ghanim,* 56 Fed.Cl. at 508 (quoting *GraphicData,* 37 Fed.Cl. at 780). On the other hand, "[i]f the answer is no, a party may supplement the administrative record when necessary to prove that evidence not in the record is evidence without which the court cannot fully understand the issues." *Id.; see also Cubic Applications,* 37 Fed.Cl. at 350 ("In order to preserve a meaningful judicial review, the parties must be able to suggest the need for other evidence, and possibly limited discovery, aimed at determining, for example, whether other materials were considered, or whether the record provides an adequate explanation to the protester or the court as to the basis of the agency action. It follows that discovery as well as the breadth of the court's review has to be tailored in each case.").

The court finds that the "agency action before the court is susceptible to record review," *Al Ghanim,* 56 Fed.Cl. at 508, in this case without need for supplementation. Indeed, the court agrees with defendant that "while [plaintiff's response] contains a lengthy discussion of case law, it contains virtually *no* discussion of why UEA believes it is necessary for UEA to supplement the record *in this case.*" Def.'s Reply at 20. The declarations annexed to plaintiff's complaint, *see* Pl.'s Compl. Exs. 11 and 12, do not aid the court in its analysis or determination of the merits of this case. These declarations do not constitute "evidence without which the court cannot fully understand the issues." *Al Ghanim,* 56 Fed.Cl. at 508. The administrative record in this case "provides an adequate explanation to the ... court as to the basis of the agency action." *Cubic Applications,* 37 Fed.Cl. at 350. Therefore, defendant's Motion to Strike is hereby GRANTED. In ruling on the parties' cross-motions for judgment on the administrative record, the court will not consider as evidence the declarations of Mr. Boyd or Mr. O'Neal, nor will the court consider as evidence the declarations of Ms. White and Ms. Davis.

## C. Standing

■ "The party invoking federal jurisdiction bears the burden of establishing [the] elements [of standing]," *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), which is "a threshold jurisdictional issue," *Myers Investigative and Sec. Servs., Inc. v. United States,* 275 F.3d 1366, 1369 (Fed.Cir.2002). Pursuant to 28 U.S.C. § 1491(b)(1), a bid protest may be brought by an "interested party." The Federal Circuit has construed the term "interested party" and found that it limits standing under the ADRA " 'to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract.' " *Banknote,* 365 F.3d at 1352 (quoting *Am. Fed'n of Gov't Employees v. United States,* 258 F.3d 1294, 1302 (Fed.Cir.2001)). This inquiry requires the court to determine whether a plaintiff has been prejudiced because "prejudice (or injury) is a necessary element of standing." *Myers,* 275 F.3d at 1370. In the sole source context,

"[a] disappointed party can establish prejudice either by showing: (1) proceeding without the violation would have made the procurement official's decision to make a sole-source award rather than to conduct a competitive bidding process irrational, and in a competitive bidding process, the complaining party would have a substantial chance of receiving the award; or (2) proceeding without the violation, the complaining party would have a substantial chance of receiving the sole-source award."

*Myers,* 275 F.3d at 1370 (quoting *Emery Worldwide Airlines,* 264 F.3d at 1086 (citations omitted)); *see also Info. Tech. & Applications Corp. v. United States (ITAC),* 316 F.3d 1312, 1319 (Fed.Cir.2003) ("To establish prejudice, [plaintiff] must show that there was a 'substantial chance' it would have received the contract award but for the alleged error in the procurement process. In other words, the protestor's chance of securing the

award must not have been insubstantial.") (citations omitted).[21]

■ Plaintiff states that it "fit[s] under number (2) [in *Myers*] because if the actions complained of ... had not improperly occurred, ... UEA would have continued to receive the sole source award." Pl.'s Mot. at 6. Indeed, plaintiff argues, CNCS specifically told the SBA on April 22, 2004 that "[i]t is [CNCS]'s intent to obtain the services of [UEA]." *Id.* at 11; AR at 602 (Letter from CNCS Contracting Officer Patricia Holliday to SBA Business Opportunity Specialist Floyd Johnson). Moreover, asserts plaintiff, "[CNCS] and Dot White in particular specifically asked for the award to be made to UEA and fully recognized the relationship between UEA and GS Tech." Pl.'s Mot. at 11. Nevertheless, according to plaintiff,

> [b]y October 26, 2004, [CNCS] had already decided to reject UEA and proceeded to perform 'predetermined evaluations[.'] In a letter dated October 26, 2004, Contracting Officer Ritchie D. Vinson asked [the] SBA how to proceed as quickly as possible to formally reject UEA. In an October 28, 2004[ ] internal memorandum, Ms. White stated that "I was under the impression that we had rejected [UEA]'s proposal for the new maintenance contract."

*Id.* at 12 (emphasis omitted). In addition, plaintiff argues that "[the] SBA ... succumbed to relentless pressure from the agency in declining the COC and failed to follow

the recommendation of regional SBA to issue [a] COC." *Id.* at 21 (emphasis and capitalization omitted). Plaintiff argues that, but for these "predetermined evaluations" and this "relentless pressure," plaintiff "would have continued to receive the sole source award," Pl.'s Resp. at 11, adding a "gross income of $2[ million] ... and ... 8 percent profit," as well as "provid[ing] excellent capabilities to advance and rise to a higher level of seeking competitive procurements," *id.* at 28. Plaintiff therefore concludes that it "has established prejudice, standing, and status as an interested party." Pl.'s Mot. at 6.

In its Cross Motion, defendant notes that "[a]lthough this was not a competitive solicitation, this case does not fit the normal sole-source bid protest fact pattern either." Def.'s Mot. at 14. Under such circumstances, defendant argues, "regardless of what type of bid protest this is ..., to have standing, a disappointed party must demonstrate that it had a reasonable chance of receiving an award. UEA's conclusory assertions that it could have performed this contract will not suffice." *Id.* Defendant states that "UEA's proposal was so deficient in so many important areas that it is not difficult to conclude that UEA had no substantial chance of receiving an award and, therefore, could not have been prejudiced by the denial of a contract and the subsequent award to another party." *Id.* at 20. Accord-

---

21. The court notes a possible discrepancy between the articulations in *Myers* and in *ITAC* of the standard for establishing prejudice in the standing inquiry. In *Myers*, the standard is whether, " 'proceeding *without the violation*, the complaining party would have a substantial chance of receiving the sole-source award.' " *Myers*, 275 F.3d at 1370 (quoting *Emery Worldwide Airlines*, 264 F.3d at 1086) (emphasis added). In *ITAC*, the standard is whether "there was a 'substantial chance' [plaintiff] would have received the contract award but for the *alleged error* in the procurement process." *ITAC*, 316 F.3d at 1319 (emphasis added). The *Myers* standard appears to require the court to determine on the merits whether there was in fact a violation of the procurement process such that, without this violation, the plaintiff would have had a "substantial chance" of receiving the award. *See Myers*, 275 F.3d at 1370-71 ("In challenging an award in court, the burden rests on the protester to affirmatively demonstrate responsibility. Because *Myers* did not establish that it was an

'interested party' under § 1491(b)(1), it did not have standing to bring this bid protest."). In contrast, the *ITAC* standard does not appear to require a finding on the merits, but rather appears to require the court simply to determine whether, but for the *alleged* violation, the plaintiff would have had a "substantial chance" of receiving the award. *See ITAC*, 316 F.3d at 1319 ("ITAC has established prejudice (and therefore standing), because it had greater than an insubstantial chance of securing the contract *if successful on the merits* of the bid protest.") (emphasis added); *cf. Banknote*, 365 F.3d at 1352 n. 3 ("[W]e are satisfied that [plaintiff] has standing to challenge the ... contract awards. This is not a case in which a contractor failed to submit a proposal or withdrew its proposal, or a case in which a disappointed bidder could not receive the award even if successful in its challenge to the winning bidder's proposal. [Plaintiff] is a disappointed bidder whose direct economic interest was affected by the contract award.") (citations omitted).

ing to defendant, if "the SBA and CNCS [had] initially selected Randolph as the proposed 8(a) contractor, UEA would not even have had the opportunity to submit a proposal. Therefore, [UEA] should not now be heard to complain because it was provided that opportunity and, despite [not having] any competition whatsoever, failed to submit an adequate proposal." *Id.* Defendant therefore concludes that the court "does not even need to address the purported irregularities [in the procurement process] alleged by UEA." *Id.* at 21.

The court agrees with defendant that this case is not a "normal sole-source bid protest." *Id.* at 14. In a typical sole source bid protest, the protestor disputes the government agency's decision to award a sole source contract to another company without providing the protestor the opportunity to bid on the contract. *See, e.g., Myers,* 275 F.3d at 1368–69. In this case, the government specifically requested that UEA submit a proposal for the sole source contracting activity at issue, subsequently made the determination that UEA was non-responsible, and ultimately awarded the contract to another company. UEA alleges that the non-responsibility determination that caused UEA to lose the sole source contract to another company was made in bad faith or was "predetermined," and that this determination was then forced upon the SBA such that the SBA was "pressured" into denying UEA a COC. *See, e.g.,* Pl.'s Mot. at 12, 21.

Under such circumstances, the court concludes that UEA has "greater than an insubstantial chance of securing the contract if successful on the merits of the bid protest." *ITAC,* 316 F.3d at 1319. Indeed, it appears to the court that but for the alleged bad faith, alleged predeterminations, and alleged pressuring, if such were to be proven, "there was a 'substantial chance' [UEA] would have received the contract award." *See id.* CNCS had specifically chosen UEA as a prospective contractor for the NCCC facilities support services contract, *see* AR at 602; the SBA had accepted the contracting requirement into the 8(a) program on behalf of UEA, *see id.* at 601; and CNCS had issued the Solicitation solely to UEA, *see id.* at 166–267. Based on these facts and the alleged violations of the procurement process, the court finds that plaintiff " 'is a disappointed bidder whose direct economic interest was affected by the contract award' " to Randolph. *See Banknote,* 365 F.3d at 1352 (quoting *Am. Fed'n of Gov't Employees,* 258 F.3d at 1302); Pl.'s Resp. at 28 ("This contract would have added gross income of $2[ million] and . . . 8 percent profit."); *see also Banknote,* 365 F.3d at 1352 n. 3 ("This is not a case in which a contractor failed to submit a proposal or withdrew its proposal, or a case in which a disappointed bidder could not receive the award even if successful in its challenge to the winning bidder's proposal."). Therefore, plaintiff is an "interested party" with standing to sue under 28 U.S.C. § 1491(b)(1).[22]

---

**22.** The court does not here determine on the merits whether there has been a violation of the procurement process, but merely finds that "there was a 'substantial chance' [plaintiff] would have received the contract award but for the *alleged* error in the procurement process." *ITAC,* 316 F.3d at 1319 (emphasis added); *see also Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed.Cir.1996) ("We think that the appropriate standard is that, to establish prejudice, a protestor must show that, had it not been for the *alleged* error in the procurement process, there was a reasonable likelihood that the protestor would have been awarded the contract.") (emphasis added); *ABF Freight Sys., Inc. v. United States,* 55 Fed.Cl. 392, 397 (2003) ("ABF has established that it 'could compete for the contract' if the *alleged* bid process improprieties were cured.") (emphasis added) (quoting *Myers,* 275 F.3d at 1370). To the extent that *Myers* requires the finding on the merits of a violation

of the procurement process for the purposes of the standing inquiry, *see Myers,* 275 F.3d at 1370 (stating that the standard is whether, "proceeding *without the violation,* the complaining party would have a substantial chance of receiving the sole-source award") (emphasis added), the court declines to find such a violation. Nevertheless, the court does not find it prudent to dismiss the case on this ground because the court perceives sufficient disparity in the articulation in the case law as to the proper standard for a finding of "prejudice," *see supra* note 21, to create uncertainty. Based on the articulation of the standard in *ITAC,* the court finds that plaintiff has sufficiently *alleged* prejudice and therefore has standing under 28 U.S.C. § 1491(b)(1). *See Data Gen. Corp.,* 78 F.3d at 1563 ("The standard reflects a reasonable balance between the importance of (1) averting unwarranted interruptions of and interferences with the procurement process and (2) ensuring that protestors who have been ad-

### D. Laches

Defendant also argues that "UEA's failure to seek judicial relief prior to June 2005 constitutes laches." Def.'s Mot. at 9. Defendant makes this argument because, "[d]espite the fact that the non-responsibility finding was made in November 2004, UEA did not file this protest until June 8, 2005, after [Randolph] was awarded [the] contract and began performance." *Id.*

■ The affirmative defense of laches requires that "1) the plaintiff delayed filing suit for an unreasonable and inexcusable length of time from the time he knew or reasonably should have known of his claim against the defendant; and 2) the delay operated to the prejudice or injury of the defendant." *Poett v. Merit Sys. Prot. Bd.,* 360 F.3d 1377, 1384 (Fed.Cir.2004); *see also JANA, Inc. v. United States,* 936 F.2d 1265, 1269–70 (Fed.Cir. 1991) (same); *Waldorf v. United States,* 8 Cl.Ct. 321, 326 (1985) ("The two essential elements of laches are an inexcusable delay by the plaintiff in filing suit coupled with prejudice to the defendant as a result of the delay."). "A contractor's failure to seek a remedy within a reasonable time may serve as the basis for dismissal of that contractor's complaint under the doctrine of laches." *Mexican Intermodal Equip., S.A. de C.V. v. United States,* 61 Fed.Cl. 55, 70 (2004). "No fixed boundaries define the length of time deemed unreasonable, and the duration should be viewed in light of the circumstances." *CW Gov't Travel, Inc. v. United States,* 61 Fed.Cl. 559, 569 (2004). The mere passage of time, without more, does not constitute laches. *Bannum, Inc. v. United States,* 60 Fed.Cl. 718, 728 (2004) (citing *Poett,* 360 F.3d at 1384), *aff'd,* 404 F.3d 1346 (Fed.Cir.2005); *CW\Gov't Travel,* 61 Fed.Cl. at 568 (citing *Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.,* 988 F.2d 1157, 1161 (Fed.Cir.1993)).

■ To establish prejudice, the defending party must show that allowing the plaintiff's claim after an unreasonable delay will cause the defending party either economic preju-

dice or prejudice in mounting a defense. *Cornetta v. United States,* 851 F.2d 1372, 1378 (Fed.Cir.1988) (en banc). Economic prejudice exists "where a defendant and possibly others ... suffer the loss of monetary investments or incur damages which likely would have been prevented by earlier suit." *Wanlass v. Gen. Elec. Co.,* 148 F.3d 1334, 1337 (Fed.Cir.1998) (quoting *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,* 960 F.2d 1020, 1033 (Fed.Cir.1992) (en banc)). Defense prejudice exists when the defendant's ability to mount a defense is impaired due to the plaintiff's delay. *A.C. Aukerman,* 960 F.2d at 1033.

The application of laches is committed to the sound discretion of the court and should not be made by reference to "mechanical rules." *Aero Union Corp. v. United States,* 47 Fed.Cl. 677, 686 (2000) (citing *A.C. Aukerman,* 960 F.2d at 1032). The burden of proof is on the party that raises the affirmative defense, here, defendant. *Advanced Cardiovascular Sys.,* 988 F.2d at 1161. In the summary judgment context, a party raising the laches defense must also establish that there are no genuine issues of material fact with respect to either delay or prejudice. *Wanlass,* 148 F.3d at 1337 (citing *Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.,* 60 F.3d 770, 773 (Fed.Cir.1995)).

■ "When a limitation on the period for bringing suit has been set by statute, laches will generally not be invoked to shorten the statutory period." *CW Gov't Travel,* 61 Fed. Cl. at 569 (citing *Advanced Cardiovascular Sys.,* 988 F.2d at 1161). Where a plaintiff brings suit under 28 U.S.C. § 1491(b), which does not itself limit the time in which a bid protest action may be brought beyond the six-year general statute of limitations applicable to Tucker Act suits, 28 U.S.C. § 2501, the court is "reluctant to invoke laches except under extraordinary circumstances." *CW Gov't Travel,* 61 Fed.Cl. at 569 ("Had Congress wanted to set a statute of limitations on bid protest actions, it would have done so. Because Congress did not so limit the jurisdiction of this Court to hear such

versely affected by *allegedly* significant error in the procurement process have a forum available

to vent their grievances.") (emphasis added).

actions, we would be reluctant to invoke laches except under extraordinary circumstances that are not present in this case."); *see also Miss. Dep't of Rehab. Servs. v. United States,* 61 Fed.Cl. 20, 30 (2004) ("The Tucker Act, which grants this Court's bid protest jurisdiction, does not limit the time in which a bid protest may be brought, allowing suits to be brought both before and after the award of a contract. Against a backdrop that disfavors the shortening of time limits prescribed by Congress, we examine the contention that [plaintiff] unreasonably delayed bringing this suit." (citing 28 U.S.C. § 1491(b))).

▅ Defendant argues that it satisfies the first prong of the laches inquiry, unreasonable delay, because "UEA waited ... more than six months after being found nonresponsible" to file suit. Def.'s Mot. at 10. Moreover, defendant argues, "the pendency of the GAO proceedings does not excuse UEA from failing to promptly commenc[e] a protest in this [c]ourt." *Id.* (citing *Gersten v. United States,* 176 Ct.Cl. 633, 364 F.2d 850, 852 (1966) ("The seeking of administrative relief which is not a prerequisite to the filing of a proper suit has often been held an inadequate excuse.")). With respect to the second prong of the laches inquiry, prejudice, defendant argues that "by waiting until after the award of the contract to Randolph, UEA has prejudiced the Government and, therefore, waived any right it may have had to seek relief from this [c]ourt." *Id.* at 11. Defendant states that

> the Government clearly would be prejudiced if UEA is granted relief in this case.... [S]ince performance has begun, Randolph is now the incumbent contractor. If the [c]ourt were to grant the relief UEA requests, an experienced, acceptable contractor would be replaced by one that the Government ... believed could not perform the work. This likely would result in the Government receiving a lower quality level of services than it currently is getting from Randolph.

*Id.* at 11–12; *see also* Def.'s Reply at 2–7. Thus, defendant concludes, "[b]ecause UEA failed to commence this action for an unreasonably lengthy period of time, and because Randolph's performance already has begun,

this [c]ourt should not reach any other issue. Rather, it should deny UEA's motion for judgment upon the administrative record, grant the Government's cross-motion, and dismiss this action upon the ground of laches." Def.'s Reply at 7.

In its Response, plaintiff states that "[t]he date of the GAO decision denying reconsideration was May 6, 2005. [Plaintiff's] filing occurred on June 6, 2005.... Thus, [defendant]'s argument that [p]laintiff [delayed] for 6 months is ... misleading." Pl.'s Resp. at 6. Plaintiff argues that it should not be penalized for waiting to file suit while the SBA determined whether to issue a COC and while the GAO ruled on plaintiff's protest because any delay resulting from waiting for the SBA or GAO's decisions is not unreasonable. *Id.* at 8, 10. Moreover, asserts plaintiff, defendant has not established that "due to th[is] delay, it [has been] prejudiced." *Id.* at 10. Nor will Randolph be prejudiced, as "every awardee under [a] contract knows that option years are not guaranteed." *Id.* Thus, plaintiff concludes that "[t]he equitable doctrine of laches does not apply in [this] case." *Id.*

The court agrees with plaintiff. Defendant has not established the "extraordinary circumstances" necessary to warrant what would essentially amount to reading a six-month statute of limitations into 28 U.S.C § 1491(b), the jurisdictional statute on which plaintiff relies. *See* Compl. at 1; *CW Gov't Travel,* 61 Fed.Cl. at 569. Even if it could be said that the delay of six months constituted an "unreasonable and inexcusable length of time from the time [plaintiff] knew or reasonably should have known of [its] claim against ... defendant," *Poett,* 360 F.3d at 1384, defendant has failed to show that it was prejudiced "*as a result of* th[is] delay," *Waldorf,* 8 Cl.Ct. at 326 (emphasis added), or that this "delay *operated to* the prejudice or injury of ... defendant," *Poett,* 360 F.3d at 1384 (emphasis added). Instead, defendant merely argues that it "clearly *would be* prejudiced if UEA is granted relief in this case." Def.'s Mot. at 11 (emphasis added); *see also id.* at 12 ("[T]he Government *might be* subject to termination costs if Randolph's contract is terminated ....") (emphasis added); *id.*

("[T]he expense to the Government in terms of time, resources, and dollars that *would* arise [if plaintiff's protest is sustained] ... would have been avoided had UEA filed a timely protest.") (emphasis added); Def.'s Reply at 4 ("If the [c]ourt were to grant the relief UEA requests—including a request for a directed award—an experienced and acceptable contractor *could be* replaced by one that the Government believed could not acceptably perform the work. This likely *would result* in the Government receiving lower quality services than it currently is getting from Randolph.") (emphasis added). This is not the standard for determining prejudice under the laches inquiry. Defendant was required to show that it *was* prejudiced *as a result of* UEA's allegedly unreasonable delay. Defendant has failed to make this required showing.[23] *Cf. Bannum,* 60 Fed.Cl. at 728 ("[T]he bar of laches cannot be invoked by the mere passage of time.") (citing *Poett,* 360 F.3d at 1384), *aff'd,* 404 F.3d 1346 (Fed.Cir.2005). Therefore, plaintiff's protest is not barred by the doctrine of laches. The court now turns to the merits.

E. Whether the Government's Actions were Arbitrary, Capricious, an Abuse of Discretion, Otherwise Not in Accordance with Law, or Were Carried Out in Bad Faith

As stated above, *see supra* Part II.A, an agency's procurement actions should be set aside when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D); *see also Bannum,* 404 F.3d at 1351 ("[T]he inquiry is whether the [government's] procurement decision was 'arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law.' ") (quoting 5 U.S.C. § 706(2)(A)). Under the arbitrary and capricious standard, the court does "not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts." *KSEND v. United States,* 69 Fed.Cl. 103, 109–10 (2005) (citing *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43, 103 S.Ct. 2856 ("[T]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency ....")).

> To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

*Citizens to Preserve Overton Park,* 401 U.S. at 416, 91 S.Ct. 814 (citations omitted); *see also Co–Steel Raritan, Inc. v. Int'l Trade Comm'n,* 357 F.3d 1294, 1309 (Fed.Cir.2004) ("[T]he ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." (quoting *Tex. Crushed Stone Co. v. United States,* 35 F.3d 1535, 1539 (1994))).

In addition, there is a "strong presumption that government ... officials exercise their duties in good faith." *Am–Pro Protective Agency, Inc. v. United States,* 281 F.3d 1234, 1239 (Fed.Cir.2002); *see also Caldwell & Santmyer, Inc. v. Glickman,* 55 F.3d 1578, 1581 (Fed.Cir.1995) ("We assume the government acts in good faith when contracting."). Indeed, in *Am–Pro,* the Federal Circuit stat-

---

**23.** To the extent that defendant argues that it was prejudiced as a result of UEA's delay by having "to expend significant resources to review UEA's proposal, defend against the GAO proceedings, issue a new solicitation, review Randolph's proposal, and award Randolph a contract," Def.'s Reply at 5, defendant's argument also fails. These are all costs that CNCS would have incurred independent of any delay by plaintiff in filing its protest with this court. *Cf. Wanlass,* 148 F.3d at 1337 (stating that economic prejudice exists " 'where a defendant and possibly others ... suffer the loss of monetary invest-

ments or incur damages which likely would have been prevented by earlier suit' ") (quoting *Aukerman,* 960 F.2d at 1033).

In addition, to the extent that defendant argues that it *was* prejudiced simply because UEA "wait[ed] until after ... [CNCS] award[ed] ... the contract to Randolph" to file this protest, Def.'s Mot. at 11, defendant's argument also fails. 28 U.S.C. § 1491(b)(1) specifically provides that "the United States Court of Federal Claims ... shall have jurisdiction to entertain [bid protests] without regard to whether suit is instituted before or after the contract is awarded."

ed that "for almost 50 years this court and its predecessor have repeated that we are 'loath to find the contrary [of good faith], and it takes, and should take, well-nigh irrefragable proof to induce us to do so.'" *Am–Pro*, 281 F.3d at 1239 (quoting *Schaefer v. United States*, 224 Ct.Cl. 541, 633 F.2d 945, 948–49 (1980)) (alteration in original); *see also Four Points by Sheraton v. United States*, 63 Fed. Cl. 341, 344 (2005) (finding that, in order for the protestor to prevail on an allegation of bias and bad faith, it must overcome the presumption of regularity and good faith); *Orion Int'l Techs. v. United States*, 60 Fed. Cl. 338, 346 (2004) (finding that "a court [must not] ... inquire into the mental processes of an administrative decisionmaker absent a 'strong showing of bad faith.'" (quoting *Aero Corp., S.A. v. United States*, 38 Fed.Cl. 408, 412 (1997))); *Hoffman v. United States*, 16 Cl.Ct. 406, 410 (1989) (finding that mere contentions of bias do not constitute proof), *aff'd*, 894 F.2d 380 (Fed.Cir.1990); *Space Age Eng'g, Inc. v. United States*, 4 Cl.Ct. 739, 744 (1984) (finding that inferences and allegations alone fail to fulfill the "clear and convincing proof" required to show impropriety on the part of the government); *CACI, Inc.-Fed. v. United States*, 719 F.2d 1567, 1581–82 (Fed.Cir.1983) (determining that the possibility and appearance or suspicion and innuendo of impropriety, without "hard facts" to support misconduct, is an inadequate basis for withholding award of the contract). The Federal Circuit further explained that "clear and convincing most appropriately describes the burden of proof applicable to the presumption of the government's good faith." *Am–Pro*, 281 F.3d at 1239. "Based on this well-established precedent, it logically follows that showing a government official acted in bad faith is intended to be very difficult, and that something stronger than a 'preponderance of evidence' is necessary to overcome the presumption that he acted in good faith, *i.e.*, properly." *Id.* at 1240.

Although it is clear that plaintiff alleges that defendant acted in bad faith, *see, e.g.*, Pl.'s Mot. at 19, 30, 33, plaintiff does not make clear whether its challenge is brought under the first basis (the procurement official's decision lacked a rational basis) or the second basis (the procurement procedure involved a violation of regulation or procedure) for relief in bid protest actions as provided in *Impresa*, 238 F.3d at 1332–33. *Compare* Pl.'s Resp. at 12 ("[CNCS]'s actions were arbitrary, capricious, in violation of the law and [made] in bad faith.") (emphasis and capitalization omitted); *id.* at 23 ("[B]efore [CNCS] could reverse itself and ... determine [that] UEA should [no longer] receive the sole source award[,] it was required to provide a rational[ ] basis for doing so.") *with* Pl.'s Mot. at 6 ("[ ]When a party contends that the procurement procedure in a sole source case involved a violation of a statute, regulation or procedure, it must establish prejudice .... [Prejudice is established] either by showing (1) ... the procurement official's decision to make a sole-source award rather than to conduct a competitive bidding process [was] irrational ... [or] (2) ... proceeding without the violation, the complaining party would have a substantial chance of receiving the award. We fit under number (2) ....")." Regardless of the basis on which plaintiff's challenge is made, plaintiff's bid protest cannot be sustained. Plaintiff has not met its "heavy burden" of showing that CNCS has not "provided a coherent and reasonable explanation of its exercise of discretion" such that CNCS's decision "had no rational basis," *Impresa*, 238 F.3d at 1332–33 (quotations and citations omitted), nor has it shown "a clear and prejudicial violation of the applicable statutes or regulations," *id.* at 1333 (quotation omitted); *Banknote*, 365 F.3d at 1351. Moreover, plaintiff has not overcome its burden of proving defendant's bad faith by "clear and convincing" evidence. *Am–Pro*, 281 F.3d at 1239. In short, plaintiff makes a number of allegations based on alleged facts that do not support the proposition that defendant's actions were undertaken in bad faith or were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). The court addresses each of these allegations in turn.

### 1. The Evaluation of UEA's Proposal Was Not Arbitrary and Capricious

■ After describing how CNCS initially selected—and the SBA initially accepted—

UEA as a prospective contractor for the contracting activity at issue,[24] as well as how CNCS made this decision in part because of UEA's connection with GS Tech, *see* Pl.'s Mot. at 9–11; AR at 629, 602, 908–09, 601, plaintiff states that, subsequent to this decision,

> [t]he contracting agency actions were all designed and taken to support Dot White's predetermination that UEA would not get the [c]ontract. This despite initially selecting UEA for [the] award. After an initial meeting with Mr. Boyd of UEA,[25] Ms[.] White formed an intense dislike for UEA, based on a combination of factors, mistakenly believing that NO involvement would be legally permitted of ... GS[ ]Tech[,] the incumbent graduating 8[ (a) ] contractor[,] in any capacity ... [,] together with an additional dislike of Rick Furnish[,] GS Tech's former project manager.

Pl.'s Mot. at 12 (footnote added). Plaintiff provides no citation or support for these allegations. *See id.* In fact, it is apparent that defendant continued to negotiate with UEA at this time (summer of 2004), as is evidenced by defendant's answering of Mr. Boyd's questions regarding the RFP, *see* AR at 268–69, allowance of an extension of time within which Mr. Boyd could submit UEA's proposal, *see id.* at 269, 273; Pl.'s SOF ¶ 50, revision of its RFP to reflect changes that had been made, *see* AR at 271, submission to UEA of a revised RFP, *id.* at 273, and an extension of time until August 6, 2004 for UEA submit its proposal, *id.* These facts are inconsistent with—rather than clear and convincing evidence supporting—plaintiff's allegation that, after the June 2004 meeting with Mr. Boyd, "Ms[.] White formed an intense dislike for UEA," Pl.'s Mot. at 12, causing her to "predetermin[e] that UEA would not get the contract," *id.* As the court stated in *Space Age,* "Inferences cannot be substituted for the 'clear and convincing proof' required" in order "to overcome the presumption that government employees

have acted conscientiously in the performance of their duties." 4 Cl.Ct. at 744 (citation omitted); *see also Morris v. United States,* 39 Fed.Cl. 7, 14 (1997) ("[M]ere bland inferences or unsubstantiated speculation are not enough to induce this court to abandon th[e] rebuttable presumption [that public officials act in good faith]."). That observation is especially true where, as here, the proposed inferences are weak or even counterfactual.

Plaintiff also alleges that "by October 26, 2004, UEA was already rejected without any substantiation [and] without a responsibility determination or pre-award survey." Pl.'s Mot. at 13. Plaintiff supports this assertion with Ms. White's statement in an October 28, 2004 internal memorandum, that she "was under the impression that we had rejected [UEA's] proposal for the new maintenance contract." AR at 478; Pl.'s SOF ¶ 76; Pl.'s Mot. at 14. Plaintiff states that

> after it was already a foregone conclusion that [Ms.] White was rejecting the award to UEA, [Ms.] White lists some purported reasons as to why she did not want UEA to be awarded the contract....
>
> [Also on October 28, 2004,] ... the problems Ms. White had with Mr. Rick Furnish were [first] listed. These alleged deficiencies were de-minimus [sic] ....

Pl.'s Mot. at 14. Defendant counters that "[n]o formal decision was made to reject UEA until November 23, 2004, when the contracting officer issued his decision that UEA was non-responsible." Def.'s Mot. at 25. Defendant argues that "[t]he fact that, prior to that date, it was obvious to some employees of CNCS, including Ms. White, that UEA's proposal was seriously flawed is simply the result of UEA's submission of a severely flawed proposal." *Id.* In sum, defendant states, "UEA improperly is attempting to shift the blame to CNCS for its failure to prepare an adequate proposal." Def.'s Reply at 15.

---

24. The court notes that defendant is correct that "the fact that UEA may have been thought to be a good candidate for the contract in the initial stages of the process" in no way "obligate[d] the Government to actually contract with UEA." Def.'s Mot. at 23–24.

25. Plaintiff is apparently referring to the meeting in early June 2004 when Mr. Boyd and Mr. Furnish went to the NCCC Southeast Regional Campus offices to discuss the follow-on contract. *See* Def.'s SOF ¶¶ 31–32.

The court agrees with defendant. Plaintiff's allegation that "it was already a foregone conclusion that [Ms.] White was rejecting the award to UEA," Pl.'s Mot. at 14, is entirely speculative and has no basis in the administrative record. Moreover, as defendant notes, "the decision of whether to accept or reject UEA's proposal was not Ms. White's to make because she was merely the [Contracting Officer Technical Representative], not the contracting officer." Def.'s Mot. at 27; see 13 C.F.R. § 125.5(a)(2) (requiring contracting officer to refer "apparent [nonresponsible] low small business offeror ... to SBA for a possible COC prior to rejecting the offeror's proposal"); 48 C.F.R. §§ 19.601(c) (same) and 19.602–1 (detailing process). Ms. White's premature "impression that [CNCS] had rejected [UEA's] proposal," AR at 478, can readily be interpreted as a reflection of the fact that CNCS was not satisfied with the proposal submitted by UEA or the recent performance of the incumbent GS Tech, which was to be UEA's subcontractor. The court cannot presume that CNCS acted in bad faith or unreasonably in evaluating UEA's proposal or GS Tech's performance, Caldwell & Santmyer, 55 F.3d at 1581 ("We assume the government acts in good faith when contracting."), especially in the face of numerous contemporaneous documents in the administrative record indicating the contrary. Indeed, Ms. White's October 28, 2004 internal memorandum "provide[s] sound reasons for th[e] decision," AR at 478, to be dissatisfied with the recent performance of GS Tech, see id. at 478–480 (providing reasons to be dissatisfied with the recent performance of GS Tech), and Ms. White's November 1, 2004 internal memorandum also provides a further reasoned explanation for CNCS's dissatisfaction with UEA's proposal and its partnership with GS Tech, see id. at 475–77. Mr. Vinson's November 9, 2004 letter to the SBA also evidences careful and reasoned decision-making rather than bad faith or unreasonableness. See id. at 470–72; Advanced Data Concepts, 216 F.3d at 1058 ("[The arbitrary and capricious standard] requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors.").

The court agrees with the GAO that

[t]he evaluation of technical proposals is a matter within the contracting agency's discretion, since the agency is responsible for defining its needs and the best method of accommodating them. In reviewing an agency's technical evaluation, GAO will not reevaluate the proposal, but will examine the record to ensure that the evaluation was reasonable, in accordance with stated evaluation criteria, and not in violation of procurement laws and regulations. The offeror has the burden of submitting an adequately written proposal, and an offeror's mere disagreement with the agency's judgment concerning the adequacy of the proposal is not sufficient to establish that the agency acted unreasonably.

In re PEMCO World Air Servs., Nos. B–284240.3, B–284240.4, B–284240.5, 2000 WL 546803, at *9 (Comp.Gen. Mar.27, 2000).[26] Plaintiff's proposal clearly had many serious flaws, see supra Part I.B, and it was entirely reasonable for CNCS employees to raise concerns regarding these flaws, as well as any concerns it had with UEA's planned Project Manager Mr. Furnish (the sole employee specifically listed on the proposal) and subcontractor GS Tech, to others in CNCS as well as to the SBA.

As defendant explains,

Of course red flags went up when UEA submitted a proposal with the wrong NAICS code. Of course red flags went up when it was discovered that UEA's proposal promised to provide support and oversight for an Air Force program (SABER) that had nothing to do with the work being solicited or the agency issuing the solicita-

---

26. "Given the diverse factual scenarios that appear before the Government Accountability Office (GAO), its decisions traditionally have been accorded a high degree of deference by the courts, particularly those involving bid protests." Hawaiian Dredging Constr. Co., Inc. v. United States, 59 Fed.Cl. 305, 311 (2004); see E.W. Bliss Co. v. United States, 33 Fed.Cl. 123, 135 (1995), aff'd, 77 F.3d 445 (Fed.Cir.1996). While GAO decisions are not binding upon this court, they may be considered as " 'expert opinion, which [the court] should prudently consider.' " Thompson v. Cherokee Nation of Okla., 334 F.3d 1075, 1084 (Fed.Cir.2003) (quoting Delta Data Sys. Corp. v. Webster, 744 F.2d 197, 201 (D.C.Cir. 1984)).

tion. These deficiencies, combined with the others contained in UEA's proposal, including but not limited to UEA's discussion of construction work that was not part of the solicitation, its reference to the inapplicable DFARS, and its utter failure to address how it would perform the work that actually was in the solicitation's [SOW],[27] provided more than sufficient grounds for agency personnel to be quite concerned about UEA's ability to perform.

Def.'s Mot. at 26 (footnote added). These concerns were not, as plaintiff contends, "foregone conclusion[s]," or "alleged deficiencies" that "were de-minimus," Pl.'s Mot. at 14, but were wholly reasonable and based on the contemporaneous factual circumstances facing CNCS, *see Citizens to Preserve Overton Park*, 401 U.S. at 416, 91 S.Ct. 814 ("The court is not empowered to substitute its judgment for that of the agency."); *Co–Steel Raritan*, 357 F.3d at 1309 (same). "[P]roposals must be evaluated on the basis of what they contain, not what their authors intended that they contain," *Andersen Consulting v. United States*, 959 F.2d 929, 934 (Fed.Cir. 1992), and "the 'subjective unexpressed intent of one of the parties' . . . is irrelevant," *id.* (quoting *ITT Arctic Servs., Inc. v. United States*, 207 Ct.Cl. 743, 524 F.2d 680, 684 (1975)). The court does not find that defendant's evaluation of plaintiff's proposal was conducted in bad faith, or was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D); *accord In re Carlson Wagonlit Travel*, No. B–287,016, 2001 WL 254317, at *5 (Comp.Gen. Mar.6, 2001) ("The burden was clearly on [the protestor] to submit an initial proposal containing adequate information to meet the requirements associated with the contract . . ., and the protestor ran the risk of having its proposal rejected by failing to do so. Given the . . . information in [the protestor]'s proposal, we do not find the agency's evaluation unreasonable.") (citation omitted).

### 2. Defendant Had No Duty to Communicate to UEA its Concerns Regarding UEA's Proposal

■ Plaintiff complains that "[h]ad [CNCS] ever communicated directly with Mr. Boyd[ ] and given UEA a chance to explain or correct any alleged deficiencies, UEA would have alleviated [CNCS]'s concerns." Pl.'s Resp. at 17. Plaintiff states specifically that "Ms. White's first concern was with Mr. Furnish [being] listed as the Project Manager[,] although she never relayed this concern to UEA. It would have taken little time and little effort for [Ms.] White to convey her concerns regarding Mr. Furnish. UEA would have quickly proposed a substitute." Pl.'s Mot. at 16 (citation omitted). Defendant responds that "UEA has failed to demonstrate that CNCS had any duty to [ask questions, seek clarifications, or express concerns to UEA]." Def.'s Mot. at 26. Moreover, defendant argues that UEA "had [no] right to materially alter its proposal—which, obviously, is what was required—so that it would have a better chance to obtain an award." *Id.* at 27.

Plaintiff has cited no contrary authority indicating that defendant had a duty to express to UEA its concerns with UEA's proposal and GS Tech's recent performance, *see generally* Pl.'s Mot. at 16; Pl.'s Resp. at 17, and the court is aware of none. Indeed, defendant had no such duty, especially given that these concerns were not regarding merely minor or clerical errors but rather material omissions and other serious flaws requiring an extensive revision of plaintiff's proposal. Thus, the court finds that it was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), for defendant not to communicate expressly all its concerns regarding deficiencies in UEA's proposal. *Cf. JWK Int'l Corp. v. United States*, 52 Fed.Cl. 650, 662 (2002) (finding, in the context of a negotiated procurement under 48 C.F.R. § 15, that "with literally dozens of

---

27. Volume I of plaintiff's proposal does not specifically address a number of the requirements listed in detail in the RFP or SOW, *see* AR at 365–86; none of the annexes provided for in the SOW is specifically referenced in Volume I of the proposal, *see id.;* nor does Volume I contain a summary of "how the requirements in the SOW will be accomplished" as requested by the RFP, *id.* at 273; *see id.* at 365–86; Transcript of Oral Argument (Tr.) at 42:15–43:17.

fundamental deficiencies having been identified in [plaintiff's] proposals ... [, defendant] did not err in concluding that the limited exchanges envisioned by [48 C.F.R. § ] 15.306(a) would serve absolutely no utility here.").

### 3. The PreAward Survey Was Not Arbitrary and Capricious

■ Plaintiff next contends that CNCS Resource Manager Ms. White "conducted what she later labeled a pre-award survey, done solely to 'appear' to conform with FAR requirements." Pl.'s Mot. at 19. Plaintiff asserts that "Dot White conducted the survey with the specific intent to harm UEA and to make it as difficult as possible for Mr. Boyd to make an effective presentation.... Dot White[']s perfunctory 'pre-award survey' cannot justify the non-award decision ...." *Id.* at 20. According to plaintiff, "[t]he pre-award survey was a sham, the decision had already been made, and this visit was for the sole purpose of acquiring negative information in order to support the predetermined decision to reject UEA's proposal." Pl.'s Resp. at 21.

Defendant responds that "[a]s an initial matter, UEA's argument is based upon a faulty premise. CNCS was not required to perform a pre-award survey.... UEA provides no statutory or regulatory support for its assertion that such a survey was required." Def.'s Mot. at 29 (citation omitted). Moreover, asserts defendant, "UEA has failed to demonstrate that the conclusions from the pre-award survey were incorrect, or that additional notice would have permitted UEA to explain ... the deficiencies in its proposal or demonstrate that it was a responsible contractor." *Id.* at 29–30; *see also* Def.'s Reply at 12.

Defendant is correct that CNCS was not required to conduct a preaward survey. Section 19.809 of the FAR states that a "contracting officer *should* request a preaward survey of the 8(a) contractor *whenever considered useful.*" 48 C.F.R. § 19.809 (emphasis added). Thus, if a contracting officer feels that a preaward survey is unnecessary, nothing in the regulations requires it. *See id.;* 48 C.F.R. § 9.106–1(a) ("A preaward

survey is normally required only when the information on hand or readily available to the contracting officer, including information from commercial sources, is not sufficient to make a determination regarding responsibility."). Nevertheless, SBA District Director Ms. Singleton suggested to CNCS in her November 11, 2004 email that CNCS conduct a preaward survey, AR at 466, and CNCS complied with this request, *see* Def.'s SOF ¶¶ 85–86; AR at 462–64 (preaward survey). After conducting the survey, Ms. White described her findings and concerns in detail in an attachment to the completed SF 1403. AR at 464; *see supra* Part I.D. There is no evidence in the administrative record to suggest that these findings were unreasonable or arbitrary and capricious, let alone made "with the specific intent to harm UEA." Pl.'s Mot. at 20; *see Am–Pro,* 281 F.3d at 1239 (recognizing a "strong presumption that government contract officials exercise their duties in good faith"); *Caldwell & Santmyer,* 55 F.3d at 1581 ("We assume the government acts in good faith when contracting."). UEA was afforded the opportunity, not required, to demonstrate that it had the capability to perform on the NCCC contract. According to Ms. White's reasoned analysis, UEA failed to do so. *See Citizens to Preserve Overton Park,* 401 U.S. at 416, 91 S.Ct. 814 ("The court is not empowered to substitute its judgment for that of the agency."); *Co–Steel Raritan,* 357 F.3d at 1309 (same). Thus, the court finds that the preaward survey was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

### 4. The Responsibility Determination Was Not Arbitrary and Capricious

■ Plaintiff further argues that "[CNCS] ... failed to actually conduct a 'responsibility determination.' [CNCS's] review ... did not rise to [the] level of a responsibility determination.... Here, the action should not [be construed to] constitute a true 'responsibility review.'" Pl.'s Reply at 17–18 (citation omitted). Plaintiff cites *Action Serv. Corp. v. Garrett,* 790 F.Supp. 1188 (D.P.R.1992) to support its assertion. *See* Pl.'s Reply at 17–18. However, the court

in *Action* overturned a contract award where "no responsibility determination was performed." *Action*, 790 F.Supp. at 1196–97. The court stated that the defendant's "failure to perform a responsibility analysis constitutes clear error." *Id.* In contrast to *Action*, defendant here performed a complete and well-reasoned responsibility analysis. Accordingly, *Action* does not support plaintiff's argument. It was only after evaluating UEA's proposal and determining it to be deficient, *see, e.g.*, AR at 47, acknowledging CNCS's dissatisfaction with the recent performance of GS Tech, *see, e.g., id.* at 478–80, 1540, 1457,[28] and properly conducting a pre-award survey with negative results, *see id.* at 462–64 (preaward survey), that CNCS Chief Contracting Officer Mr. Vinson made the rational determination that UEA was nonresponsible, *see generally* 48 C.F.R. §§ 9.103 and 9.104–1; *supra* notes 15 and 16. In accordance with the FAR, this determination was based on an evaluation of "certain elements of responsibility" required "to perform facilities support services," AR at 454; 48 C.F.R. § 19.602–1, "including, but not limited to, capability, competency, capacity . . ., perseverance, tenacity, and limitations on subcontracting," 48 C.F.R. § 19.602–1; *see* AR at 454–58. Mr. Vinson then properly informed the SBA of this decision and detailed the reasons therefor, in accordance with 48 C.F.R. § 19.602–1 and 13 C.F.R. § 125.5(c). *See* AR at 455; *supra* note 17.

Under these circumstances, the court does not find that "[CNCS]'s review . . . did not rise to [the] level of a responsibility determination." Pl.'s Reply at 17. Indeed, " '[c]ontracting officers are "generally given wide discretion" in making responsibility determinations and in determining the amount of information that is required to make a responsibility determination.' " *Bender Shipbuilding & Repair Co. v. United States*, 297 F.3d 1358, 1362 (Fed.Cir.2002) (quoting *Impresa*, 238 F.3d at 1334–35 (quoting *John C. Grimberg Co. v. United States*, 185 F.3d 1297, 1303 (Fed.Cir.1999))). As the Federal Circuit found in *Bender*, the court finds that,

based on the preponderance of the evidence contained in the administrative record, Mr. Vinson

> examined all of the relevant . . . data before him, and then carefully articulated a detailed explanation for his decision. The contracting officer's action was the product of reasoned decision making and was amply supported by facts in the record. . . .
>
> . . .
>
> Simply put, the contracting officer made an informed, complicated business judgment based upon ample factual support in the record, and the agency provided a coherent, reasonable explanation for the exercise of the contracting officer's discretion. Responsibility decisions are largely a matter of judgment, and contracting officers are normally entitled to considerable discretion and deference in such matters. When such decisions have a rational basis and are supported by the record, they will be upheld.

*Bender*, 297 F.3d at 1362; *see also News Printing Co. v. United States*, 46 Fed.Cl. 740, 746 (2000) (" 'A contracting agency has broad discretion in making responsibility determinations since it must bear the brunt of difficulties experienced in obtaining the required performance. Responsibility determinations are of necessity a matter of business judgment . . . .' ") (quoting *In re House of Commc'ns & Graphics*, Nos. B–245,920, B–245920.2 1992 WL 55054, at *2 (Comp.Gen. Mar. 4, 1992)); *Shields Enters., Inc. v. United States*, 28 Fed.Cl. 615, 625 (1993) (" '[I]t is well-established that the contracting official has a considerable degree of discretion in arriving at a responsibility determination.' ") (quoting *Hayes Int'l Corp. v. United States*, 7 Cl.Ct. 681, 685 (1985)).

This is not a case in which the defendant did not conduct a responsibility determination, *cf. Action*, 790 F.Supp. at 1196, or in which the administrative record itself demonstrates that the plaintiff was in fact responsible, *cf. SPM Mfg. Corp.*, Nos. B–228,078, B–228078.2, 1988 WL 222767, at *2–4 (Comp.

---

**28.** Consideration of the recent performance of GS Tech, UEA's likely subcontractor, was not improper. *See* 48 C.F.R. § 9.104–4(a) ("Determinations of prospective subcontractor responsi-bility may affect the Government's determination of the prospective prime contractor's responsibility.").

Gen. Apr.18, 1988) ("[A] nonresponsibility determination will not be found to be reasonable where it is based primarily on unreasonable or unsupported conclusions in preaward surveys.... [Here, i]n several instances the ... survey actually lends support to the protestor's contention that it is responsible ...."), *cited in* Pl.'s Mot. at 12. Besides vague, speculative generalizations and post-hoc references to UEA's qualifications, plaintiff cites no evidence indicating that CNCS's non-responsibility determination was made in bad faith or was arbitrary and capricious. *See generally* Pl.'s Mot.; Pl.'s Resp. In contrast, the administrative record is replete with contemporaneous explanations of the bases on which CNCS determined UEA to be non-responsible. *See, e.g.,* AR at 478–80, 475, 471, 464, 454; *see supra* Parts I.C–E; *Advanced Data Concepts,* 216 F.3d at 1058 ("[The arbitrary and capricious standard] requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors.").[29] Under such circumstances, and without more, the court will not disturb CNCS's determination that UEA was non-responsible.

### 5. The SBA's COC Review was Not Arbitrary and Capricious

▇ Plaintiff alleges that the SBA "succumbed to relentless pressure from [CNCS] in declining the COC and failed to follow the recommendation of regional SBA to issue [a] COC." Pl.'s Mot. at 21 (emphasis and capitalization omitted). Plaintiff cites emails written on November 12, 2004 to support the proposition that the "SBA buckled under Agency pressure," Pl.'s Resp. at 20, and plaintiff states that SBA Industrial Specialist Mr. Hansen "disregarded the certification and recommendation of Deputy District Director Singleton as well as the analysis performed back in April when UEA was reviewed, and instead echoed Dot White[']s sham survey report." Pl.'s Mot. at 23. Fur-

thermore, plaintiff alleges, "Mr. Hansen chose to ignore the [r[é]sum[é]s of alternate project managers he had ... and still focused on Dot White's concerns about [Rick] Furnish." *Id.* In short, plaintiff argues that "[CNCS] pressured ... [Mr.] Hans[e]n to decline the COC," Pl.'s Resp. at 25, which ultimately resulted in UEA's failure to receive the CNCS contract award.

Defendant responds that "Ms. Singleton's recommendation was limited ... to a financial review. It did not address the numerous technical deficiencies in the UEA's proposal, or [that were] apparent from the pre-award survey." Def.'s Mot. at 32 (citing AR 1462–66). Moreover, defendant states that "UEA provides no evidence in support of th[e] claims [that Mr. Hansen succumbed to pressure from CNCS, disregarded Ms. Singleton's recommendations, or acted in bad faith]." *Id.* According to defendant, regardless of what additional materials UEA submitted to the SBA during the COC review, "UEA's proposal speaks for itself," Def.'s Reply at 13, and "[t]here was nothing improper in Mr. Hansen's conduct" in reviewing these materials and ruling on UEA's responsibility, *id.* at 14.

As an initial matter, "this court has jurisdiction to review the SBA's denial of ... plaintiff's application for a COC pursuant to the court's jurisdiction over bid protests." *CSE Constr. Co.,* 58 Fed.Cl. at 247; *see Cavalier Clothes, Inc. v. United States,* 810 F.2d 1108, 1111 (Fed.Cir.1987) ("The mere fact that [15 U.S.C. § 637(b)(7)(A)] commits the 'final disposition' of the competency certification to the SBA does not immunize from judicial review the refusal to grant a COC."); *Stapp Towing, Inc. v. United States,* 34 Fed. Cl. 300, 306 (1995) ("Unquestionably, the Court of Federal Claims has jurisdiction to review the COC determination."). The court reviews the SBA's competency determinations under the same "arbitrary and capricious" standard it applies to agency procurement actions, *CSE Constr. Co.,* 58 Fed.Cl. at

---

**29.** The court further notes that

correct appraisal of the responsibility of a prospective contractor is clearly in the self-interest of the procuring agency; there is a built-in stimulus against error. If the determination is erroneous, and the contractor ultimately defaults on his obligation, the Government will

likely suffer substantial delay and inconvenience, even though the defaulting party will be liable to answer in damages, including perhaps reprocurement costs.

*Keco Indus., Inc. v. United States,* 203 Ct.Cl. 566, 492 F.2d 1200, 1205–06 (1974).

248, although "certain deference must be accorded the unique expertise that [the] SBA[ ] unquestionably possesses in the area of business responsibility determinations," *Stapp Towing*, 34 Fed.Cl. at 306. "Accordingly, this court will overturn an SBA competency determination only if it appears by a preponderance of the evidence 'that the SBA's COC decision of nonresponsibility had no rational basis or that, in making the decision, the SBA violated an applicable procurement statute or regulation in a manner prejudicial to the protesting bidder.'" *CSE Constr. Co.*, 58 Fed.Cl. at 248 (quoting *Stapp Towing*, 34 Fed.Cl. at 306).

The court agrees with defendant that "UEA provides no evidence in support of th[e] claims [that Mr. Hansen succumbed to pressure from CNCS, disregarded Ms. Singleton's recommendations, or acted in bad faith]." Def.'s Mot. at 32. The November 12, 2004 emails which plaintiff reads as demonstrating that the "SBA buckled under Agency pressure," Pl.'s Resp. at 20, are at least as easily understood as demonstrating entirely proper behavior. CNCS was attempting to comply with what it understood to be the proper procedure under the 8(a) Program for rejecting a proposal it deemed to be deficient. *See* AR at 466–67 (email from NCCC Contract Specialist Marilyne Brooks to SBA Representatives Theresa Singleton and Floyd Johnson) ("I kindly ask you to please revisit [CNCS's] request for an 8(a) replacement and/or to please advise what we can do to resolve this issue immediately."). The SBA declined to "just replace [UEA]," *id.* at 466, instead advising CNCS to conduct a preaward survey and, "[i]f the results of the preaward survey or other information available to the contracting officer raise substantial doubt as to the firm's ability to perform," to refer the matter to the SBA for COC review, *id.* Rather than evidencing that the SBA "buckled under Agency pressure," Pl.'s Resp. at 20, this exchange demonstrates that the SBA refused to circumvent what it believed to be proper procedure by replacing UEA with another contractor without any review. *See* AR at 466–67. Moreover, the court agrees with defendant that CNCS's effort to get "a rush" on the COC,

*id.* at 466, "merely shows that . . . CNCS was attempting to make sure that the COC process . . . did not cause undue delay." Def.'s Reply at 15. Attempting to expedite a time-sensitive process, without more, does not amount to arbitrary or capricious activity, bad faith, or improper "pressure."

▮▮ In addition, SBA District Director Singleton's recommendation for approval of the COC was based on UEA's financial capability and did not conclude the COC review process. *See* 48 C.F.R. § 19.601(a) (listing other factors, in addition to financial capability, to be considered by the SBA pursuant to the COC review process); *C & G Excavating v. United States*, 32 Fed.Cl. 231, 238–39 (1994) ("The literal language of [48 C.F.R. § 19.601(a)] implies that in issuing the COC, the SBA may evaluate all elements of responsibility. The general factors to be evaluated in determining whether a prospective contractor qualifies as responsible are set forth at [48 C.F.R.] § 9.104–1. These factors include an evaluation of the prospective contractor's financial resources, performance record, and production facilities.") (citation omitted). SBA Industrial Specialist Mr. Hansen conducted a comprehensive evaluation of UEA's technical and performance capabilities and material availabilities and prepared a rational, detailed, and well-reasoned Narrative Report, *see* AR at 1419–22 (Narrative Report); *see also supra* Part I.E, determining that "UEA . . . does not have the technical ability to perform on this bid requirement," *id.* at 1420; *see Advanced Data Concepts*, 216 F.3d at 1058 ("[The arbitrary and capricious standard] requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors."). The court does not presume, absent any evidence, that Mr. Hansen disregarded Ms. Singleton's recommendation or that he was "pressured" into making this determination. Nor does the court presume that SBA Area Director Mitchell Morand's final decision to deny the COC was irrational or made in bad faith.[30] *See* AR at 1478 (January 6, 2005 letter of Mr. Morand denying COC) ("Based on comprehensive analysis of all available facts and information, the SBA has determined to decline to issue a

---

**30.** Plaintiff cites *In re Kari–Vac, Inc.*, No. B–    210,609, 1983 WL 26941 (Comp.Gen. Jun.9,

**32**

COC in this instance."); *Morris*, 39 Fed.Cl. at 14 ("Mere bland inferences or unsubstantiated speculation are not enough to induce this court to abandon th[e] rebuttable presumption [that public officials act in good faith]."); *Space Age*, 4 Cl.Ct. at 744 (1984) ("Inferences cannot be substituted for the 'clear and convincing proof' required" in order "to overcome the presumption that government employees have acted conscientiously in the performance of their duties.") (citation omitted). Instead, the determinations of Messrs. Hansen and Morand are afforded a high degree of deference. *See Stapp Towing*, 34 Fed.Cl. at 306. Accordingly, the court finds that the SBA's decision to decline to issue a COC was not made in bad faith and was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).[31]

### 6. Conclusion

For the foregoing reasons, the court determines on the merits that defendant's actions

1983) for the proposition that, after the COC review process, "the record [was] so muddled so as to require the relief plaintiff requests ..., i.e.[,] directed award and/or independent reevaluation. In *Kari–Vac*, the SBA "denied Kari–Vac a COC because of its determination that Kari–Vac was not eligible for the COC program .... [The] SBA did not review the specific reasons for GSA's nonresponsibility determination and has recently indicated a willingness to reopen the matter of Kari–Vac's responsibility." *Kari–Vac*, 1983 WL 26941, at *4. The SBA in this case made no such determinations or indication. Thus, *Kari–Vac* is inapposite.

31. The court has ruled that neither CNCS's activity regarding the COC process, nor the SBA's decision to deny the COC, was arbitrary or capricious. For completeness, the court addresses in this footnote an additional issue raised and briefed by the parties that has not required decision by the court to resolve the case before it.

In responding to plaintiff's attack on the COC process, defendant first argues that "the SBA's COC process was erroneously instituted in this case.... Therefore, any alleged errors in that process can provide no grounds for upholding UEA's protest." Def.'s Mot. at 31 (citations omitted). Indeed, according to defendant, "the COC process afforded UEA an extra opportunity to overcome its earlier faults, yet UEA failed [even with] this added opportunity." *Id.* Plaintiff initially agreed that, in the sole source context, COC review was not required, *see* Pl.'s Mot. at 33 ("Plaintiff ... does not dispute ... whether the non-competitive 8[(a)] procurement required [COC] review. We believe it did not ...."), but later reversed its view at oral argument, *see* Tr. at 26:25–27:2 (plaintiff's counsel stating that he disagrees that COC review is not required in this context). After extended discussion at oral argument about whether referral to the SBA for issuance of a COC is required by the applicable statutes or regulations in the context of a sole source 8(a) Program procurement, *see* Tr. at 26:10–39:21, the court sought supplemental briefing from the parties on this subject, *see* Order of October 14, 2005.

Primarily at issue is the SBA's interpretation of 15 U.S.C. § 637(b) (2000). As explained below, regulations and discussions in the Federal Regis-

ter implementing this statutory provision appear to the court to be inconsistent with the statutory provision as well as with each other, making it unclear whether COC review is required in the context of a sole source 8(a) Program procurement. To be sure, the court agrees with defendant that "the SBA provided [COC] review to UEA in this case. Therefore, UEA cannot argue that it was denied COC review." Def.'s Suppl. Br. at 16. Moreover, the court has determined that this COC review was not arbitrary and capricious. *Supra* Part II.E.5. Thus, the court agrees with defendant that even if COC review was not required in this context, "UEA simply was not prejudiced by the extra layer of review it received," Def.'s Suppl. Br. at 16.

Because the court finds that plaintiff was not prejudiced by receiving COC review by the SBA, the issue of whether COC review is in fact required by the applicable statutes or regulations in the context of a sole source 8(a) Program procurement is not dispositive of this case. *See Banknote*, 365 F.3d at 1351 ("'When a challenge is brought on the [ground that the procurement involved a violation of regulation or procedure], the disappointed bidder must show a clear *and prejudicial* violation of applicable statutes or regulations.'" (quoting *Impresa*, 238 F.3d at 1333)) (emphasis added). Nevertheless, the complexity of the issue and the parties' disagreement, *compare* Pl.'s Suppl. Resp. at 1 ("It is [p]laintiff's contention that the statute is unambiguous, thus requiring a COC determination.") *with* Def.'s Suppl. Br. at 7 ("[T]he SBA has authority to determine that COC procedures will not be conducted in 8(a) sole-source awards."), lead the court to address the apparent inconsistencies among the applicable statutes, regulations, and discussions in the Federal Register regarding the necessity of COC review in the context of sole source 8(a) Program procurements.

15 U.S.C. § 637(b) provides, in pertinent part:

It shall ... be the duty of the [SBA] and it is empowered, whenever it determines such action is necessary—

....

(7)(A) To certify to Government procurement officers ..., with respect to all elements of responsibility, including, but not limited to, capability, competency, capacity, credit, integ-

rity, perseverance, and tenacity, of any small business concern or group of such concerns to receive and perform a specific Government contract. *A Government procurement officer ... may not, for any reason specified in the preceding sentence, preclude any small business concern or group of such concerns from being awarded such contract without referring the matter for a final disposition to the [SBA].*

15 U.S.C. § 637(b) (emphasis added). The regulations implementing this statutory authority are set forth in part at 13 C.F.R. § 125.5, entitled "Certificate of Competency Program." 13 C.F.R. § 125.5 states, in pertinent part:

(a) *General.* (1) The Certificate of Competency (COC) Program is authorized under section 8(b)(7) of the Small Business Act. A COC is a written instrument issued by [the] SBA to a Government contracting officer, certifying that one or more named small business concerns possess the responsibility to perform a specific Government procurement (or sale) contract. *The COC Program is applicable to all Government procurement actions . . . .*

(2) A contracting officer must, upon determining an apparent low small business offeror to be nonresponsible, refer that small business to [the] SBA for a possible COC, even if the next low apparently responsible offeror is also a small business.

(3) A small business offeror referred to [the] SBA as nonresponsible may apply to SBA for a COC. . . . .

. . . .

(c) *Referral of nonresponsibility determination to SBA.* (1) A contracting officer who determines that an apparently successful offeror that has certified itself to be a small business with respect to a specific Government procurement lacks any element of responsibility (including competency, capability, capacity, credit, integrity or tenacity or perseverance) must refer the matter in writing to the SBA Government Contracting Area Office (Area Office) serving the area in which the headquarters of the offeror is located. . . .

. . . .

(m) *Effect of a COC.* By the terms of the Act, a COC is conclusive as to responsibility. Where [the] SBA issues a COC on behalf of a small business with respect to a particular contract, contracting officers are required to award the contract without requiring the firm to meet any other requirement with respect to responsibility.

(n) *Effect of Denial of COC.* Denial of a COC by [the] SBA does not preclude a contracting officer from awarding a contract to the referred firm, nor does it prevent the concern from making an offer on any other procurement.

13 C.F.R. § 125.5 (emphasis to captions in original; other emphasis added).

A number of other federal regulations, including provisions of the FAR pertaining to small business programs (48 C.F.R. Chapter 1, Subchapter D, Part 19) and contractor qualifications (48 C.F.R. Chapter 1, Subchapter B, Part 9), discuss the SBA's COC review program. 48 C.F.R. § 19.601 states, in pertinent part:

(b) The COC program empowers the Small Business Administration (SBA) to certify to Government contracting officers as to all elements of responsibility of any small business concern to receive and perform a specific Government contract. . . .

(c) *The COC program is applicable to all Government acquisitions.* A contracting officer *shall,* upon determining an apparent successful small business offeror to be nonresponsible, refer that small business to the SBA for a possible COC, even if the next acceptable offer is also from a small business.

48 C.F.R. § 19.601 (emphasis to caption in original; other emphasis added). 48 C.F.R. § 19.809 states, in pertinent part: "If the results of the preaward survey or other information available to the contracting officer raise substantial doubt as to the firm's ability to perform, the contracting officer *must* refer the matter to [the] SBA for [COC] consideration under subpart 19.6." 48 C.F.R. § 19.809 (emphasis added). 48 C.F.R. § 9.103 states, in pertinent part: "In the absence of information clearly indicating that the prospective contractor is responsible, the contracting officer shall make a determination of nonresponsibility. If the prospective contractor is a small business concern, the contracting officer *shall* comply with subpart 19.6, Certificates of Competency and Determinations of Responsibility." 48 C.F.R. § 9.103(b) (emphasis added). 48 C.F.R. § 9.104–3 states, in pertinent part: "If a small business concern's offer that would otherwise be accepted is to be rejected because of a determination of nonresponsibility, the contracting officer *shall* refer the matter to the [SBA], which will decide whether or not to issue a [COC] (see subpart 19.6)." 48 C.F.R. § 9.104–3(d)(1) (emphasis added). 48 C.F.R. § 9.105–2 states, in pertinent part: "If the contracting officer determines and documents that a responsive small business lacks certain elements of responsibility, the contracting officer *shall* comply with the procedures [for COC review] in subpart 19.6." 48 C.F.R. § 9.105–2(a)(2) (emphasis added).

All of the passages in the Code of Federal Regulations emphasized above appear to the court to be consistent with the language in 15 U.S.C. § 637(b)(7)(A), which provides that "[a] Government procurement officer ... may not, for any reason specified in the preceding sentence [concerning elements of responsibility], preclude any small business concern or group of such concerns from being awarded [a specific government] contract without referring the matter for a final disposition to the [SBA]." However, the SBA, in amending its regulations in 1998 to provide for the applicability of COC review to non-responsibility determinations made in the context of 8(a) Program procurements, stated as follows:

Proposed § 124.507(b)(5) would add the Certificate of Competency (COC) procedures to competitive 8(a) procurements. Where a procuring agency contracting officer finds the ap-

parent successful offeror for a competitive 8(a) procurement not to be responsible to perform the contract, he or she would be required to refer the Participant to SBA for a possible COC under the procedures set forth in § 125.5 of this chapter. SBA seeks to make competitive 8(a) procurements as similar as possible to non–8(a) Government contracting procedures. *COC procedures would not, however, be available for sole source 8(a) procurements.* In most cases, the procuring agency would have selected the Participant for the sole source contract by assessing the firm's capabilities prior to offering the procurement to SBA. It is unlikely that the procuring agency would select a Participant, go through negotiations with the firm, and then find the firm not to be responsible. If that does happen, or if the procuring agency determines that a firm nominated by SBA for an open requirement cannot perform the contract, SBA would review the situation to determine whether it agrees with the procuring agency. If SBA agrees, it can nominate another Participant to perform the contract, if one exists that is found to be eligible and responsible for the requirement, or it can permit the agency to withdraw the requirement from the 8(a) program if an eligible and responsible Participant is not found. If SBA does not agree, it can appeal the procuring agency's decision to the head of the procuring agency pursuant to § 124.505.

*Small Business Size Regulations; 8(a) Business Development/Small Disadvantaged Business Status Determinations; Rules of Procedure Governing Cases Before the Office of Hearings and Appeals,* 62 Fed.Reg. 43,584, 43,592 (Aug. 14, 1997) (emphasis added). Before the 1998 amendments, the SBA's regulations specifically provided that the COC process did not apply either to sole source or to competitive 8(a) awards. *See Minority Small Business and Capital Ownership Development Program,* 54 Fed.Reg. 34,692, 34,709 (Aug. 21, 1989) ("The COC program does not apply to 8(a) contracts."). Rather, in the 8(a) Program context, 13 C.F.R. § 124.313(a) (1998) provided that the SBA itself would "certify" that a firm "is competent to perform the requirement ... based on [the SBA's] determination that the 8(a) concern with which it intends to subcontract is responsible to perform the requirement." Therefore, until 1998, after "[a] Participant ... [was] determined by SBA not to be responsible to perform a sole source or competitive 8(a) contract," that 8(a) Program Participant "[could] not seek the issuance of a Certificate of Competency," *id.* § 124.313(c), because the SBA had itself already evaluated the Participant's responsibility and made a responsibility determination.

As explained by defendant, "in 1998, instead of certifying the responsibility of 8(a) contractors to perform specific 8(a) contracts in every case, the SBA restructured the program so that participants could self-market to [government] procuring officers who would then primarily be responsible for making the necessary responsibility determinations." Def.'s Suppl. Br. at 12. In so doing, the SBA determined that COC review would be available to prospective competitive 8(a) contractors determined to be non-responsible by the government, but not to prospective sole source 8(a) contractors. 62 Fed.Reg. at 43,592 ("COC procedures would not, however, be available for sole source 8(a) procurements."). Based on the foregoing, the GAO determined that

> once CNCS determined that UEA was nonresponsible, and informed [the] SBA of that determination, [the] SBA, if it agreed with CNCS, should have allowed for the replacement of UEA with another 8(a) vendor .... If [the] SBA disagreed with CNCS regarding its determination that UEA was nonresponsible, the Administrator of [the] SBA could have appealed the CNCS contracting officer's responsibility determination to the head of the procuring agency. 13 C.F.R. § 124.505(a)(2). In short, we agree with [the] SBA that it erred in considering UEA for a COC because the COC process is not applicable to noncompetitive 8(a) acquisitions.

AR at 839; *In re United Enter. & Assocs.,* No. B–295,742, 2005 WL 762262, at *4 (Comp.Gen. Apr.4, 2005) (citation omitted).

The court agrees with the GAO that the above discussion in the Federal Register appears to envision this result. Indeed, the facts of this case track those discussed in the Federal Register. Here, "the procuring agency ... select[ed] a Participant, [went] through negotiations with the firm, and then f[ou]nd the firm not to be responsible." 62 Fed.Reg. at 43,592. However, the SBA's discussion in the Federal Register of the procedure to apply when an agency determines that a prospective sole source 8(a) Program contractor is non-responsible appears to the court to be inconsistent with the clear mandate of Congress that "[a] Government procurement officer ... may not, for any reason specified in the preceding sentence [concerning elements of responsibility], preclude any small business concern or group of such concerns from being awarded [a specific government] contract without referring the matter for a final disposition to the [SBA]." 15 U.S.C. § 637(b)(7)(A); *cf. Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.").

Moreover, the Federal Register discussion appears to the court to be inconsistent with many other regulations currently in force. *See, e.g.,* 13 C.F.R. § 125.5(a)(1) ("The COC Program is applicable to all Government procurement actions."); 48 C.F.R. § 19.601(c) ("The COC program is applicable to all Government acquisitions. A contracting officer shall, upon determining an apparent successful small business offeror to be nonresponsible, refer that small business to the SBA for a possible COC ...."); 48 C.F.R. § 19.809 ("If the results of the preaward survey or other infor-

mation available to the contracting officer raise substantial doubt as to the firm's ability to perform, the contracting officer must refer the matter to [the] SBA for [COC] consideration under subpart 19.6."); 48 C.F.R. § 9.103(b) ("In the absence of information clearly indicating that the prospective contractor is responsible, the contracting officer shall make a determination of nonresponsibility. If the prospective contractor is a small business concern, the contracting officer shall comply with subpart 19.6, Certificates of Competency and Determinations of Responsibility."); 48 C.F.R. § 9.104–3(d)(1) ("If a small business concern's offer that would otherwise be accepted is to be rejected because of a determination of nonresponsibility, the contracting officer shall refer the matter to the [SBA], which will decide whether or not to issue a[COC] (see subpart 19.6)."); 48 C.F.R. § 9.105–2(a)(2) ("If the contracting officer determines and documents that a responsive small business lacks certain elements of responsibility, the contracting officer shall comply with the procedures [for COC review] in subpart 19.6."); *see also Lion Raisins, Inc. v. United States*, 52 Fed.Cl. 629, 632 (2002) ("[R]egardless of whether a small-business set-aside is involved, before rejecting a small business's bid on grounds of non-responsibility, an agency must refer the matter to the SBA, which, in its discretion, may issue a COC.").

Defendant argues that "the language [of 15 U.S.C. § 637(b)(7)(A) ] ... merely requires that a contracting officer refer [the] matter to the SBA for a final disposition ...; [i]t does not require, either implicitly or explicitly, that a *COC procedure* ... be employed by the SBA." Def.'s Suppl. Reply at 4. Although the court agrees with defendant that the COC procedure is not specifically required by § 637(b)(7)(A), that law does contemplate that a "final disposition by the [SBA]" will be made. 15 U.S.C. § 637(b)(7)(A). Section 637(b)(7)(A) does not define "final disposition," nor do any other statutory provisions or regulations relating to government contracting through the SBA of which the court is aware. *See generally* 15 U.S.C. §§ 631–657; 13 C.F.R. Ch. I. However, 13 C.F.R. § 125.5(a) implements the COC program and states that "[t]he ... [p]rogram is authorized under [15 U.S.C. § 637(b)(7)]." Moreover, a COC determination appears to the court to be a "final disposition," 15 U.S.C. § 637(b)(7)(A), by the SBA after an agency's non-responsibility determination. *See* 13 C.F.R. § 125.5(m) ("By the terms of the [Small Business] Act, a COC is conclusive as to responsibility. Where SBA issues a COC on behalf of a small business with respect to a particular contract, contracting officers are required to award the contract without requiring the firm to meet any other requirement with respect to responsibility."); 48 C.F.R. § 19.602–4(b) ("SBA COC[]s are conclusive with respect to all elements of responsibility of prospective small business contractors."). In contrast, simply "ap-

peal[ing] the procuring agency's decision to the head of the procuring agency," 62 Fed.Reg. at 43,592; *see* 13 C.F.R. § 124.505(a)(2) ("The Administrator of SBA may appeal ... to the head of the procuring agency ... [a] contracting officer's decision to reject a specific Participant for award of an 8(a) contract after SBA's acceptance of the requirement for the 8(a) [Business Development] program ...."), does not appear to the court to be such a "final disposition."

The apparent inconsistency between 15 U.S.C. § 637(b)(7)(A) and various regulations implementing it, on the one hand, and the SBA's discussion in the Federal Register, on the other, has been noted in expert commentary. *See* Ralph C. Nash & John Cibinic, *Competition & Award: Certificate of Competency and 8(a) Contracts*, 19 Nash & Cibinic Report, No. 6, ¶ 30 (June 2005) (Nash & Cibinic), at 92 (Steve Feldman, commenting on this issue in a letter to Professor Cibinic) ("To an extent, the[se] ... regulations require the referral of any small business concern to the SBA for a possible COC whenever the agency deems the firm nonresponsible. Thus, an important inconsistency exists in the FAR and the [Code of Federal Regulations] on the COC referral process for apparently nonresponsible 8(a) concerns in sole-source 8(a) procurements."); *id.* at 93 (Professors Nash and Cibinic, responding to Mr. Feldman's letter) ("[W]e wonder whether the exception of sole-source 8(a) participants from COCs is authorized in view of the specific requirements of 15 [U.S.C.] § 637(b)(7)(A) .... ").

In 1992, the Court of Appeals for the D.C. Circuit examined the applicability of COC review to the 8(a) Program. *DAE Corp. v. Engeleiter*, 958 F.2d 436, 439 (D.C.Cir.1992). The court held that, under the regulatory provisions at that time, COC review was not applicable to the 8(a) Program because "under [§ 8(a)] ..., the SBA, not the procuring agency's contracting officer, [already] assesses the responsibility of the prospective contractor." *Id.* (citing 13 C.F.R. §§ 124.308 and 124.313). Therefore, at that time, an 8(a) Program contractor did not need the protections provided by the SBA's COC review because it was the SBA itself that assessed the responsibility of the contractor under the 8(a) Program. In contrast, COC review *was* available "when a procuring agency contracting officer," rather than the SBA, "questions the responsibility of a small business." *Id.* The court articulated the policy justification for this determination as follows: "[Section] 637(b)(7) is designed to help small businesses overcome the hesitanc[y] a procuring agency may have in awarding an ordinary contract to a small business." *DAE*, 958 F.2d at 439 (citing *In re Custom Research, Inc.*, Nos. B–238,976, B–238976.2, 1990 WL 278095, at *1 (Comp.Gen. Jun.14, 1990) (explaining that the COC process "is provided by law to protect small businesses from arbitrary nonresponsibility determinations made by procurement agencies.")). The court continued, "[S]mall businesses benefit from the COC program because it gives them an

were not made in bad faith, and were not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). Plaintiff has not met its "heavy burden" of proving that CNCS's decision to deny UEA the NCCC maintenance support services contract "had no rational basis," *Impresa*, 238 F.3d at 1333 (quotations and citations omitted), or that the process it followed in making this decision involved "a clear and prejudicial violation of applicable statutes or regulations," *id.* at 1333 (quotation omitted); *Banknote*, 365 F.3d at 1351 (quoting *Impresa*, 238 F.3d at 1333). Nor has plaintiff met its burden of proving by "clear and convincing" evidence that defendant acted in bad faith in making this decision. *Am–Pro*, 281 F.3d at 1239. Plaintiff has failed to show that it is entitled to receive this sole source award despite CNCS's well-documented, reasoned, rational, and procedurally sound determination that plaintiff was non-responsible. *See Advanced Data Concepts*, 216 F.3d at 1058 ("The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors."); 13 C.F.R. § 124.501(c) ("Admission into the 8(a) [Business Development] program does not guarantee that a Participant will receive 8(a) contracts.").

### F. Plaintiff is Not Entitled to Injunctive Relief

Plaintiff has not succeeded on the merits and is therefore not entitled to injunctive relief. *See PGBA*, 389 F.3d at 1228–29 ("In deciding whether a permanent injunction should issue, a court considers ... whether, *as it must*, the plaintiff has succeeded on the merits of the case ....") (emphasis added); *CSE Constr. Co*, 58 Fed.Cl. at 262 ("[A]

---

opportunity to have the SBA rather than a procuring agency determine their responsibility ...." *Id.* at 439–40.

It appears to the court that, after the 1998 amendments by the SBA removed, inter alia, the regulation providing that the SBA makes the ultimate responsibility determination for all 8(a) Program contractors, 13 C.F.R. § 124.313(a) (1998), the policies articulated in *DAE* were potentially undermined in the context of sole source 8(a) procurements. In particular, under the procedure provided in 62 Fed.Reg. at 43,592, where an 8(a) concern negotiating for a sole source contract is determined to be nonresponsible by a contracting agency and that agency does not "refer the matter for a final disposition to the [SBA]," 15 U.S.C. § 637(b)(7)(A), but instead merely informs the SBA of its decision and awaits the possibility that the SBA will "appeal the procuring agency's decision to the head of the procuring agency pursuant to § 124.505," 62 Fed.Reg. at 43,592, the 8(a) concern is not afforded the "opportunity to have the SBA rather than a procuring agency determine [its] responsibility ...," *DAE*, 958 F.2d at 439–40; *compare* Nash & Cibinic at 93 (Steve Feldman stating that, "[i]n contrast [to] the COC program, the SBA under this informal review process need not contact the 8(a) concern in a noncompetitive acquisition and allow it to rebut the agency's nonresponsibility opinion") *with* 54 Fed.Reg. at 34,703–34,709 (1989) (the SBA under the former C.F.R. § 124.308 will "discuss the matter with the firm ... to determine whether the firm can perform the ["sole source] contract"); *see also* Nash & Cibinic at 93 (Professors Nash and Cibinic stating that "[w]e ... agree ... that it

makes no sense to apply the COC procedures to firms in competitive 8(a) procurements while exempting a sole-source 8(a) participant").

Defendant states that *DAE* remains pertinent in that it illustrates that "the 8(a) and 8(b) [15 U.S.C. § 637(b) ] contracting programs are distinctly different programs with different purposes." Def.'s Suppl. Br. at 15. Defendant argues that "[f]rom this circumstance alone, the SBA could reasonably conclude that the 8(b) COC procedures are not mandated under Section 8(a)." *Id.* However, defendant cites, and the court has found, no statute, regulation, statutory or regulatory history, or case indicating that where a small business concern is operating under the 8(a) Program, the SBA may ignore the mandates of section 8(b). Nor does defendant account for the numerous current regulations cited in this footnote indicating that the COC process, implemented by section 8(b), *see* 13 C.F.R. § 125.5(a), is applicable to *all* government procurements. *See generally* Def.'s Suppl. Br.; Def.'s Suppl. Reply; *see also* Tr. at 37:3–38:19 (Ms. Lewis, SBA counsel, explaining that "[the COC provisions are] for the more general small business contracting [and] small business companies, as opposed to just 8(a) companies," and answering, in response to the court's query as to "why [§ 8](b)(1)(A) is applicable to 8(a) contracts and [§ 8](b)(7)(A) is not," that she "can see [the court's] point .... It's just that the [SBA] has interpreted 637(b) ... not to be required ... for 8(a) contracting."). Given the resolution of the case on other grounds, the court need not resolve the propriety of the government's contention that the SBA is not required to apply section 637(b) to an 8(a) Program contract.

permanent injunction requires success on the merits.").

## III. Conclusion

For the foregoing reasons, plaintiff's Motion for Judgment on the Administrative Record is DENIED and defendant's Cross Motion for Judgment on the Administrative Record is GRANTED. The Clerk of the Court shall enter judgment DISMISSING the complaint. No costs.

On or before March 20, 2006, the parties, together or separately, may file requests for deletion of protected/privileged material from the published opinion to be issued by the court. Each such request shall identify with particularity the proposed deletion and the reason therefor.

IT IS SO ORDERED.